UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRUCE DOYLE,<br><br>        Plaintiff,<br><br>   v.<br><br>GALDERMA, INC.,<br><br>        Defendant. | Case No. 19-cv-05678 (TSH)<br><br>**ORDER RE: MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY ADJUDICATION**<br><br>Re: Dkt. Nos. 26 |

## I.  INTRODUCTION

Pending before the Court is Defendant Galderma Laboratories, L.P.'s ("Galderma's") February 4, 2021 Motion for Summary Judgment, or, in the Alternative, Partial Summary Adjudication ("Summary Judgment Motion").  ECF No. 26.

Plaintiff Bruce Ian Doyle ("Doyle") sued Galderma in Alameda County Superior Court on July 5, 2019.  Doyle asserts three causes of action: (1) Age Discrimination in violation of California's Fair Employment and Housing Act ("FEHA"); (2) Wrongful Termination in Violation of Public Policy; (3) Breach of Implied Contract Not to Terminate Without Good Cause.  ECF No. 1, Galderma's Notice to Federal Court of Removal of Civil Action ("Removal Notice"), Ex. A, Complaint ("Complaint").  Doyle also seeks an award of punitive damages.  Id.

On September 9, 2019, Galderma removed to federal court based on diversity jurisdiction pursuant to 28 U.S.C. 1332(a).

Having considered the parties' positions, relevant legal authority, and the record in this case, the Court GRANTS Galderma's Summary Judgment Motion.

## II.  BACKGROUND

The following facts are taken from the Summary Judgment Motion, the Opposition to

Summary Judgment Motion ("Opposition" or "Opp."), ECF No. 29, and the Reply to the Opposition ("Reply"), ECF No. 32, and are set forth for purposes of background.

## A. Doyle's Employment History With Galderma

Doyle was hired by Owen Labs in April of 1989 as a district sales manager. Declaration of Demery Ryan in Support of the ("ISO") Summary Judgment Motion ("Ryan Decl.") ¶ 2, Ex. A, September 9, 2020 Deposition of Bruce Ian Doyle ("Doyle Dep.") 13:8-16. In the early 1990s, Owen Labs was acquired by Galderma (Doyle Dep. 13:21-23), a pharmaceutical manufacturer of prescription and over-the-counter dermatological products. Declaration of Edith Flores ISO Summary Judgment Motion ("Flores Decl.") ¶ 2.

Doyle became a Regional Sales Manager ("RSM") for Galderma in 1999, which was equivalent to the current Area Director position. Doyle Dep. 14:4-6. Doyle returned to the district sales manager position in 2007. Doyle Dep. 15:1-9. In approximately 2014, Doyle's position was renamed Senior Regional Sales Manager ("Senior RSM") (Doyle Dep. 15:10-22), a position he held until his termination (Doyle Dep. 26:14-19) in April 2019 at age sixty-four. At all times from at least 1999 until his termination, Doyle was an at-will employee. As he himself admitted in his deposition, there was no employment contract. Doyle Dep. 18:16-23.

Doyle claims in his declaration, and supports with "a chronological sampling of the [sic] some of the awards, raises, and bonuses I received during the course of my career" that: between 1989 and 2015, Doyle earned multiple awards including District Sales Manager of the Year awards in 1990 and 1994, RSM of the Year award in 2003, Five Inner Circle Awards (top 10% in sales), 13 President's Awards (top 20% in sales), over 15 merit salary increases, and received twenty-nine consecutive favorable annual performance reviews in which he was rated as meeting expectations or higher. Declaration of Bruce Ian Doyle in Opposition to Galderma's Summary Judgment Motion ("Doyle Decl."), ¶¶ 2-4.

From approximately 2014 to the end of his employment at Galderma, Doyle managed a sales team of prescription pharmaceutical sales representatives in the West and Northwest. Doyle Dep. 28:15-25. In the last two to three years of Doyle's employment, the team Doyle managed focused on a portfolio of prescription products for acne and rosacea, which included Soolantra, Epiduo Forte, and Oracea. Doyle Dep. 29:1-30:5. Doyle's supervisor from October 2016 until the

1   end of his employment was Ken Curley ("Curley").  Doyle Dep. 27:10-12; 27:21-28:3; Ryan Decl.

2   ¶ 3, Ex. B, First Deposition of Ken Curley, September 14, 2020 ("Curley Dep. 1") 59:2-22;

3   Declaration of Ken Curley ISO Summary Judgment Motion ("Curley Decl.) ¶ 2.

4          From 2016-2019, Curley was the Area Sales Director and the Senior Area Sales Director

5   of the West Area, one of the three regions in the Galderma Prescription Sales Business Unit ("Rx

6   Business Unit") (Curley Decl. ¶¶ 2-3), the other two being the Central and East regions.  Ryan

7   Decl. ¶ 4, Ex. C, Deposition of Chad Collins December 2, 2020 ("Collins Dep.") 12:4-21.  One of

8   the regions in the West Area was the San Francisco region, managed by Doyle in his role as

9   Senior RSM in the Rx Business Unit.  Curley Decl. ¶ 3.  As of January 2019, Curley supervised

10  six RSMs, who in turn supervised approximately fifty sales representatives.  Declaration of Robert

11  Wallace in Support of the Opposition ("Wallace Decl.") ¶ 11, Ex. 10, Curley Dep. 1 63:4-17.

12  During the time Curley supervised Doyle from October 2016 through May 1, 2019, Curley did not

13  have power to manage high level corporate affairs and had no authority to influence or affect

14  corporate policy.  Curley Decl. ¶ 13.  During all times relevant to this action, Curley was not an

15  officer or director of Galderma.  *Id.*

16         From approximately January 2016 to January 2020, Chad Collins ("Collins") was Vice

17  President of Sales of Galderma's Rx Business Unit.  Declaration of Chad Collins in Support of

18  Galderma's Summary Judgment Motion, ("Collins Decl.") ¶ 1; Doyle Dep. 39:5-7.  He was

19  Curley's direct supervisor from 2016 through Doyle's termination.  Doyle Dep. 38:11-15; Curley

20  Dep. 1 58:23-59:1.  As such, Collins supervised three Area Directors, over twenty RSMs,

21  including Doyle, and between one hundred twenty-five to one hundred seventy-five sales

22  representatives throughout the entire country.  Wallace Decl. ¶13, Ex. 12, Collins Dep. 14:5-

23  17:22.  Collins had no power to manage high level corporate affairs nor authority to influence or

24  affect corporate policy.  Collins Decl. ¶ 2.  Collins was not an officer or director of Galderma at

25  any time.  *Id.*

26         Doyle was an at-will employee throughout his employment at Galderma.  Doyle Dep.

27  17:18-18:11; 18:16-23.  Doyle's 1999 promotion letter, the applicable Galderma Employee

28  Handbook, and the language of Doyle's PIP demonstrate Doyle's at-will status.  Doyle Dep.

    16:23-19:14, Ex.1; 98:25-99:14, Ex. 15; Flores Decl., Ex. A.  Nevertheless, Doyle asserts that,

"based upon Galderma's conduct over his 30-year career, Mr. Doyle understood that Galderma needed good cause to fire him."  Doyle Decl. ¶ 24.

**B.     Measurement of RSMs' Performance, Setting Sales Quotas, and Sales Bonus Payments**

Doyle stated in his deposition the most important metric of job performance for RSMs is their sales results.  Doyle Dep. 64:7-9.  Galderma primarily measured Doyle's performance as an RSM based on how his team performed compared to product quotas set for each of the products in his region's portfolio.  Doyle Dep. 30:6-13.  During 2014-2019, RSMs were also measured by their success at deploying money Galderma allocated to them for Peer to Peer education programs and extended selling events, that is, informational events outside the health care providers' places of business.  Doyle Dep. 34:23-37:4.  During the last couple of years of Doyle's employment, Galderma also measured the performance of RSMs, including Doyle, by sales call cycle frequency and the quantity and quality of field coaching reports, collectively known as Management by Objectives ("MBOs").  Doyle Dep. 34:6-35:1.  Call cycle frequency means that the team conducts a certain number of sales calls on a select group of doctors in a prescribed period of time, and field coaching reports are written feedback and suggestions drafted by an RSM to provide to direct reports (sales representatives whom the RSM supervises) after accompanying them on sales calls.  Doyle Dep. 36:3-15.

In 2017, 2018, and 2019, Doyle worked with Galderma's Sales Compensation Manager, Tonia Moseley ("Moseley"), on setting quotas in his region's portfolio.  Doyle Dep. 30:6-31:12; Ryan Decl., ¶ 5, Ex. D, December 16, 2020 Deposition of Tonia Moseley ("Moseley Dep.") 10:20-11:3.  Moseley helped manage the process of developing commission plans and setting sales quotas.  Moseley Dep. 12:9-14.  In setting quotas, she worked with different levels of the Galderma sales organization, worked with data vendors, and verified sales professionals' performance against their quotas.  Moseley Dep. 13:10-18; 17:3-22; 24:2-7; 25:16-19; 33:2-13.  Galderma's quotas are crafted carefully.  Moseley Dep. 22:11-24:1; 46:4-12.  Performing above goal with key brands and increasing share with promoting strategic topical products was a goal for Doyle every year.  Doyle Dep. 64:2-6.

Moseley testified in her declaration that "bonus payments did not equate to excellence in

4

sales." Supplemental Declaration of Tonia Moseley ("Supp. Moseley Decl.") ¶ 2. She explained that "[a]ll Galderma sales professionals receive commission incentive payments (also known as bonus payments) based on the amount of units of product sold in their territory." *Id.* An "RSM such as Doyle received a bonus payment for their direct reports; sales starting when that RSM reached [a certain percentage] of their quota," meaning that "sales professionals, including Doyle, who did not meet their quota or were bottom performers could and did receive bonus payments." *Id.*

**C.     Doyle's Mixed Performance History, Particularly in Sales**

Doyle received a rating of "developmental opportunity," the lowest rating on a Galderma performance review for behavioral competencies (Doyle Dep., 40:18-41:13; 43:8-14; Ex. 4, p. 1), for sales results in four out of five years from 2014-2018. The relevant aspects of Doyle's sales performance are as follows:

2014: Doyle received a rating of developmental opportunity from his prior manager (i.e., not Curley) for achievement in sales results and was advised to "achieve or exceed national performance levels." Doyle Dep. Ex. 4 at p. 5. Doyle himself identified sales results as a "primary shortcoming" (Doyle Dep. 45:21-46:2; Ex. 4) and acknowledged that his team needed further development. Doyle Dep. 44:4-10; Ex. 4.

2015: Doyle received a rating of "developmental opportunity" for sales achievement. Doyle Dep. 47:3-22; Ex. 5. Doyle grew market share of one product, Epiduo, by only .68 as compared to 1.4 growth nationally and did not hit the targets for either of the key products he was promoting, Epiduo and Soolantra, through August 2015. Doyle Dep. 47:23-48:8; Ex. 5. Doyle was also the subject of complaints from his subordinates, which were memorialized in a document called "Stop… Start… Continue for Ian Doyle." Doyle Dep. 49:2-20; Ex. 6.

2016: Doyle received an "effective" rating in his Overall Contribution Assessment during his annual performance review, including a rating of "strength" for sales achievement from Curley. Doyle Dep. 59:23-63:10; Ex. 7; Doyle Decl. ¶ 4. Curley warned Doyle, though, that "to remain a strength, performance above goal with our key brands will need to occur as well as increasing share with the promoted strategic topical brands." Doyle Dep. 63:12-64:1; Ex. 7.

In his declaration, Doyle also claims he achieved 98.19% of his sales quota, a $59,243 sales performance bonus, and received his sixth President's Award. Doyle Decl. ¶ 4.

2017: In his declaration, Doyle states that he received an "effective" rating in his Overall Contribution Assessment in his annual performance review rating (Doyle Decl. ¶ 5), but a rating of "developmental opportunity" for sales achievement. Doyle Dep. 65:15-66:1; Ex. 8. Doyle claims that he achieved 99.68% of his sales quota and received a $71,252 sales performance bonus. Doyle Decl. ¶ 5. However, Doyle performed below target at 85% of quota with the product Soolantra and below target with the other two products he promoted, Tri-Luma and Epiduo through May 2017. Doyle Dep. 66:20-67:6. Doyle admitted that his rating of "developmental opportunity" for sales achievement was not unfair and that he needed to improve as of 2017. Doyle Dep. 67:24-68:11; 69:1-6.

2018: In Doyle's Mid-Year Review, Curley told him he was trending towards receiving an overall Needs Improvement rating on his Year-End Performance Review based on Doyle's first half of 2018 performance. Doyle Dep. 69:7-72:1; Ex. 9. "Needs Improvement" is the lowest rating possible on Galderma's assessment scale and means that Doyle did not meet the expected requirements of the position. Doyle Dep. 92:8-11; Ex. 13; Doyle Decl. ¶ 6, Ex. 2. Curley also told Doyle he had a shortfall in deploying resources for peer-to-peer programing. Doyle Dep. 70:25-71:4. Doyle himself said he did not consider this review unfair. *Id.* 74:2-8.

Doyle and Curley had a one on one meeting in June 2018. *Id.* 76:1-17; Ex. 10. On June 26, 2018, Curley followed up this meeting with an email (*id.* 75:13-20; Ex. 10) telling Doyle that he was falling short of the sales metrics (*id.* 77:16-22; Ex. 10) and "it was important to hit these metrics in Q3 ensuring both quality and effective spend, execution and deployment of resources. Failure to hit these metrics will result in a more formalized improvement plan being put in place." *Id.* 79:16-23; 80:7-13; Ex. 10.

Notwithstanding these early warnings, his rating in 2018 for Overall Contribution Assessment was, in fact, "Needs Improvement" (Doyle Dep. 92:8-11; Ex. 13), despite receiving an annual performance rating of "Strength" or "Meets Expectations" for areas unrelated to his sales deficiencies – namely Courage and Integrity, Collaboration, Impact and Influence, Organizational

Sense, Innovation, Team Leadership, and Change Leadership. Doyle Decl. ¶ 6, Ex. 2. During his deposition, Doyle admitted that the overall "Needs Improvement" rating was fair. Doyle Dep. 92:8-14.

By the end of 2018, Doyle had failed to meet his quota in any of the three products he promoted (Doyle Dep. 72:13-16; 87:15-88:20; 103:10-18; Ex. 13; Ex. 15), reaching only 94.22% of his sales quota. Doyle Decl. ¶ 6, Ex. 2. Doyle ranked last in the area for award (sales) performance, last in the nation for all Q4 prescription contests, his field coaching reports were below objective for all quarters, his call cycle attainment was below objective for all quarters, and he underinvested resources, facts admitted by Doyle. Doyle Dep. 103:10-104:25. Additionally, Doyle's region came in last in sales performance attainment for all six regions of the West area, and last in sales attainment of all eighteen regions of the Rx Business Unit across the nation. Doyle Dep. 89:8-19; 89:23-90:3; Curley Depo 1, 118:2- 119:25; Curley Decl., ¶ 6.

<u>2019</u>: Based on his 2018 performance, Doyle was placed on a Performance Improvement Plan ("PIP") in the first quarter of 2019 ("Q1 2019"), an action he did not think was unfair. Doyle Dep. 91:4-18. When Curley was asked in his deposition why he recommended Doyle be placed on a PIP, he replied, "Sales performance, coaching of his team members, an increased need for investment of resources, specifically based on the first half of 2018, inability to keep call cycle attainment, ranked 18 of 18 for the year out of sales managers." Curley Dep. 1, 118:2-9.

Human Resources Director Edith Flores ("Flores"), Curley and Collins were involved in the decision to place Doyle on a PIP. Collins Dep. 73:22-74:10; Curley Dep. 1, 115:22-116:2; Ryan Decl. ¶ 6, Ex. E, November 19, 2020 Deposition of Edith Flores ("Flores Dep.") 14:8-12. Catherine King, Associate Human Resources Director, also reviewed and was part of the administration of the PIP. Ryan Decl. ¶ 7, Ex. F, November 20, 2020 Deposition of Catherine King ("King Dep.") 28:9-18; 77:24-80:4; Flores Dep. 75:10-15.

Doyle received his PIP on February 1, 2019, about a week to ten days after receiving his 2018 Performance Review. Doyle Dep. 93:5-8. Doyle asserts in his declaration that his PIP contained performance expectations that were not consistent with existing expectations for all RSMs and that he was not informed about the requirements of his PIP or that failure to meet them

could result in termination until he was given the PIP on February 1, 2019.  Doyle Decl. ¶ 10.  In declaring this, however, Doyle contradicts his own deposition testimony that he was aware Galderma would terminate him if he did not meet the PIP's deliverables.  When asked what his understanding was of the consequences if he did not meet the parameters laid out in his PIP, he answered, "Ultimately, termination."  Doyle Dep. 122:25-123:4.

Doyle was made aware in December 2018 and early January 2019 of most of the expectations that were later included in his PIP – expectations that were also shared with all other RSMs and Senior RSMs under Curley – via emails sent by Curley and RSM Pete Frey.  On January 4, 2019, Doyle was provided with the call cycle attainment and field coaching reports objectives for Q1 2019 when Curley sent an email correspondence to all RSMs and Senior RSMs in the West region, including Doyle.  Curley Decl. ¶ 7, Ex. A.  This email provided objectives for call cycle attainment and field coaching reports: the target objective for all RSMs and Senior RSMs, including Doyle, for the quantity of field coaching reports in Q1 2019 was 10 field coaching reports; the objective for the call cycle attainment for all RSMs and Senior RSMs, including Doyle, 80%, remained the same from 2018 to 2019.  *Id*.  As part of Doyle's Q1 2019 PIP Curley asked Doyle to achieve the field coaching objective of quantity and quality for Q1 2019 and to achieve a reduced amount of 75% call cycle attainment.  *Id*.  The PIP provided performance expectations that were consistent with existing expectations for all RSMs and Senior RSMs, except that in this area Doyle's expectation was 5% less than other RSMs.  *Id*.

In December 2018 and early 2019, RSMs and Senior RSMs in the West Area under Curley's direction, including Doyle, also received notice of Galderma's expectations for extended selling and execution of sales programs for Q1 2019.  Curley Decl. ¶ 8.  Extended selling means informational events outside of health care providers' places of business.  *Id*.  In mid-December 2018, Doyle and Curley discussed that Doyle's 2019 Semester 1 Extended Selling Budget would be $72,000 for the San Francisco region of the West Area, which conversation was memorialized in a December 13, 2018 email sent by RSM Pete Frey.  *Id*., Ex. B.  On January 2, 2019, Frey sent an email to Curley and to all RSMs and Senior RSMs of the West Area, including Doyle, providing the expectations for the Extended Selling Budget for Q1 2019 for RSMs and Senior

RSMs of the West Area including Doyle.  *Id.*, Ex. C.

On December 17, 2018, Frey sent email correspondence and an attachment to all RSMs and Senior RSMs of the West Area, including Doyle, on which Curley was copied, containing expectations for Peer to Peer events for 2019 including the expected number of each type of event per 2019 sales quarter and the average number of attendees expected per event for RSMs and Senior RSMs in each region in the West Area.  Curley Decl. ¶ 9, Ex. D.  Execution of sales programs refers to the three types of Peer to Peer educational events for Galderma's prescription acne and rosacea medications:  Local Community Discussions, Speaker Programs, and Expert on Demand.  *Id.*

In addition, Moseley, who worked with Doyle to set his sales quota, testified that Doyle learned of his quota for Q1 2019 by mid-January of 2019, as she sent it to him on January 7 and followed up with a telephone conference on January 11, 2019.  Moseley Decl. ¶ 2, Ex. A.  Besides which, Doyle understood that performing above goal with key brands and increasing share with promoting strategic topical products was a goal for him every year.  Doyle Dep. 64:2-6.

Doyle testified at his deposition that he knew about the PIP performance expectations before receiving the PIP because Curley had counseled him on the subjects listed as concerns therein.  Doyle Dep. 102:19-105:11, Ex. 15.  The PIP prefaces the deliverables by saying, "As previously discussed during one on ones, your year-end performance assessment, and follow up feedback discussion, there are a number of areas where you need to immediately improve your performance."  Doyle Dep. 103:1-9; Ex. 15.  When the PIP preface was read to him verbatim at his deposition, he responded that he did recall that these were all subjects about which he had previously been counseled.  Doyle Dep. 103:1-9.  Furthermore, Doyle himself was involved in the drafting of the PIP, as he asked Curley to change two things in the PIP, which Curley did.  Curley Dep. 1, 128:13-16.

Collins also confirmed that "a lot of the expectations . . . are things that he would have - - should have already started at the beginning of the quarter anyway."  Collins Dep. 88:16-19. Flores also testified that providing a PIP to an employee after the start of a PIP "is acceptable if you had expectations set and you've had conversations around performance already."  Flores Dep.

40:24-25.

## D.    Content of the PIP ("PIP Deliverables")

As part of the PIP, Galderma asked Doyle to demonstrate improvement in five categories. (Doyle Dep., Ex. 15). The PIP Deliverables were as follows:

PIP Deliverable 1: Doyle was to perform at or above 100 percent of his Q1 2019 quota and the national average for total prescription attainment for Q1 2019.  Doyle Dep., Ex. 15.  Doyle understood this to mean he was to meet his personal sales quota for Q1 2019 and also be above the national average.  Doyle Dep. 105:18-25.  Curley did not modify Doyle's individual Q1 2019 quota allocation recommended by Moseley in early January 2019.  Moseley Dep. 65:3-12.

PIP Deliverable 2: Doyle was to achieve 75% of call cycle attainment and achieve a field coaching objective of quantity and quality for Q1.  Doyle Depo, Ex. 15; Curley Decl., ¶ 7, Ex. A. The 75% call cycle attainment in Doyle's PIP was lower than the 80% call standard for all RSMs. Collins Dep. 88:2-19; Doyle Dep. Ex. 15; Curley Decl. ¶ 7, Ex. A.

PIP Deliverable 3: Doyle was to invest more than $32,000 of his Semester 1 extended selling budget in Q1.  Doyle Dep. Ex. 15; Curley Decl. ¶ 7, Ex. A.

PIP Deliverable 4: Doyle was to conduct three extended selling interactions outside of the office.  Doyle Dep. 107:8-19, Ex. 15; Curley Decl. ¶ 7, Ex. A.

PIP Deliverable 5: Doyle was to execute sales programs (i.e. peer-to-peer programing) consistent with the expectations for all RSMs.  Ryan Decl., 8, Ex. G, December 9, 2020 Deposition of Ken Curley ("3rd Curley Depo") 18:9-22:18; Curley Decl. ¶ 9, Ex. D.  Specifically, Doyle was to conduct at least two acne and two rosacea LCDs (Local Community Discussions) and/or SPs (Speaker Programs), plus three acne and four rosacea EODs (Expert on Demand) in Q1 (Doyle Dep. Ex. 15) with attendee targets of an average of at least four attendees per LCD, nine and a half attendees for any speaker program, and 1.6 attendees for EODs, in line with all RSMs. Doyle Dep. 109:13-19; Ex. 15; 3rd Curley Dep. 18:9-22:18; Curley Decl. ¶ 9, Ex. D.

Under the terms of the PIP, PIP Deliverables 2-5 were to be met by March 30, 2019, the last day of Q1.  Doyle Dep. 110:12-15; Ex. 15.  Whether PIP Deliverable 1 had been met was to be determined as of the "Release of the Q1 Integrated Report."  Doyle Dep. Ex. 15.

**E.     PIP Template, Timeframe, and Inclusion of National Average**

Though the specific PIP Deliverables were tailored to the issues that Doyle needed to correct, the overall format and language regarding ongoing expectations came from an existing Galderma performance improvement plan template utilized by Curley in drafting the PIP.  Flores Dep. 83:4-84:9; Flores Decl. ¶¶ 3-4 Exs. B and C.  Doyle doesn't contradict this fact when he asserts that "Curley drafted plaintiff's PIP and authored the five 'deliverables' included therein." Boilerplate language from the template was included in Doyle's PIP, including a sentence that these expectations are "permanent and to be maintained during the course of your employment with Galderma."  Flores Dep. 83:4-84:9; Flores Decl. ¶¶ 3-4 Ex. B, Ex C.  Flores testified that neither she, nor King, nor Curley drafted the statement (Flores Dep. 83:8-20) but that it came from "a general template for performance improvement plans [Curley used] as a guide."  Flores Dep. 83:22-25.  She stated that managers were able "to use and customize" the PIP template to "suit each employee's situation."  Flores Decl., ¶ 4.  Galderma submitted both a copy of the template and another PIP containing the exact same "boilerplate" language that Doyle claims singled him out.  *Id*., Exs. B & C.

Doyle asserts that this language is unique and made his PIP a "Forever PIP."  Doyle also claims that including the requirement that he meet or exceed the national average for sales in PIP Deliverable 1 was unique to him and therefore discriminatory.  He asserts that other RSMs who did not attain this level of sales were not disciplined or terminated.

However, all Galderma employees asked about this language testified that it merely indicated that Galderma expected Doyle's sales performance to remain at a high level for as long as he was employed there.  In his deposition, Collins agreed that Mr. Doyle had to meet the national sales average permanently "or at least until some unspecified time in the future."  Collins depo 97:15 - 99:12.  King denied that this language imposed a unique and onerous requirement with which Doyle alone had been burdened.  She testified, "I interpret it as [requiring] sustained performance throughout the rest of the time he was at Galderma" and indicated that we "needed to see sustained improvement and "[a]gain, this is a template that was utilized."  Wallace Decl., King Dep. 92:15- 19; 93:1-4.  King acknowledged that, in her opinion, it was "good human resources

11

practice based on [her] experience and training to have very identifiable performance goals" and "good and important to have a clearly articulated start and end date for the PIP." *Id*. 55:24-56:5. She did not, as Doyle asserts, articulate this as Galderma company policy that Doyle's PIP had therefore violated.

Flores testified that "[t]he national average is a common key performance indicator that we do use when it comes to evaluating performance for rankings and awards and as we look at just in terms of where people fall. For several business reasons, we do look at national average and we look at targets." Flores Dep. 86:19-25. Curley testified that he included the national sales metric to take into account Doyle's performance relative to his peers, to ensure that he was performing at or above average. Curley Dep. 1, 133:14-22. Specifically, Curley said, "The concern would be, should we have a significant market event where the overall company performed way above 100 percent or for some reason deductibles didn't hit as high as they were planning in Q1 or an unseen market event that pushed all the others up, with [Doyle] ranking 18 of 18 in 2018 from a growth standpoint in both contests, I wanted to make sure he was performing at or above average of his peers in addition to being 100 percent" of his own sales quota. *Id*.

Collins, too, saw the national average as an important benchmark for performance. Specifically, Collins testified that "The whole reason [the national average] is in there of having any specificity is the fact that we have been underperforming for the last couple of years relative to the nation, relative to "X", right? So for me, as I look at this, I look at this and say, yeah, I mean, we're trying to get you [Doyle] to a new level, a level that should be at a minimum expected. And yes, you [Doyle] should continue permanently staying at that level. Now, does it mean exactly at the national average and all that forever and forever? I'm sure that we would re-evaluate that after the PIP, see where we were originally and then afterwards, right? So it's speculative to think, you know two quarters from this point forward, what would the conversation be? The conversation really is built on . . . what happened in the quarter." Wallace Decl., Collins Dep. 98:11- 99:12.

**F.    Galderma Tried to Help Doyle Meet PIP Deliverables**

Curley testified that if Doyle had met these five deliverables and performed satisfactorily,

and there were no other "extenuating circumstances," he would not have been fired. Curley depo 176:6-17. During Doyle's PIP, Curley met with Doyle on a bi-weekly basis and received bi-weekly updates from Doyle. Doyle Dep. 111:2-112:12. Curley told Doyle he was "here to support you and your efforts to succeed in Q1." Doyle Dep. 148:3-19, Ex. 16. What's more, throughout his PIP, Doyle had access to weekly data showing his sales for the quarter through at least April 12, 2019. Doyle Dep. 169:3-6. Doyle acknowledges that he had access to his sales numbers but complains that they were only estimates. Moseley Dep. 37:13-15. As noted above, Curley reduced Doyle's PIP Deliverable 2 by 5% relative to other RSMs.

## G. During the PIP, Curley Learned of Doyle's Behavioral Issues

During Q1 2019, the period covered by the PIP, Curley learned of two customer complaints about Doyle's behavior, the first from Dr. Lui, the second from Ada West, as well as several complaints from Doyle's direct reports.

### 1. First Customer Complaint: Dr. Liu

In January 2019, Curley was told of a complaint about Doyle from a customer, Dr. Clive Liu in Seattle, stemming from an office visit Doyle made in November 2018 to Dr. Liu with one of his sales representatives, Tom Gonzales. Ryan Decl., ¶ 9, Ex. H, Second Deposition of Ken Curley, October 9, 2020, Vol. II ("Curley Dep. 2") 199:1-22; Ryan Decl., ¶ 10, Ex. I, September 16, 2020 Deposition of Tom Gonzales ("Gonzales Dep."); 38:8-19; Ryan Decl., ¶ 11, Ex. J, November 17, 2020 Deposition of Brandon Boyd ("Boyd Dep.") 44:2-8. Dr. Liu reported to Brandon Boyd, Gonzales' counterpart in Seattle, that Galderma was banned from his practice due to Doyle's behavior. Boyd Dep. 48:19-49:15.

In January 2019, Boyd notified Curley of this complaint from Dr. Lui's office concerning Doyle's behavior during the office visit. Boyd Dep. 44:2-45:5. He relayed his conversation with Dr. Liu and told Curley that Dr. Liu wanted Curley to travel to Seattle and meet him face-to-face to have him apologize to himself and his wife because of his perception of the severity of Doyle's poor behavior. *Id.* He said that he had told Doyle about Dr. Liu's complaint in November 2018 and that he "did not think [Doyle] was taking it seriously." Boyd Decl. 46:1-10.

Curley investigated Dr. Lui's complaint, speaking with Boyd, Gonzales, and Doyle – but

not yet to Dr. Liu. Doyle submits as an undisputed fact his own self-serving opinion testimony from his declaration that indicates his view that "nothing had happened" during the visit. Doyle Dec. ¶ 9. On January 10, 2019, Curley wrote an email about the incident recording these conversations, including his own view that it was "out of character" for Doyle to act as Dr. Liu said he had. Curley Dep. 2 Ex. 12.

Curley called Dr. Liu in January 2019 but did not actually talk with him until March 2019, when Dr. Liu reported to Curley that Galderma was not allowed in his office as a result of the incident with Doyle, that he did not want Doyle in the office ever, and that he threatened to inform all dermatologists of the "bad behavior that Galderma management exhibited in his practice" if Curley did not make an in-person apology to him and his wife for Doyle's behavior. Curley Dep. 2, 204:3-16, 207:10-208:9, Ex. 13. In April 2019, Curley flew from Texas to Seattle to apologize personally to Dr. Liu and his wife, a condition Dr. Liu required in order to repair Galderma's relationship with him. Doyle Depo 97:5-12; Curley Dep. 2, 204:3-9, 205:2-24; Curley Decl., ¶ 10.

### 2. Second Customer Complaint: Ada West

After the complaint from Dr. Liu, Curley became aware in February and March 2019 of a second complaint about Doyle from a different medical provider, Ada West, Galderma's largest dermatology practice client in the Boise metro area. Doyle Dep. 177:25-178:12; Curley Dep. 2, 210:18- 212:1. Multiple Ada West staff had complained to their office manager, Mart, about Doyle's overbearing behavior and invasion of office staff's personal space. Ryan Decl. ¶ 13, Ex. L, December 4, 2020 Deposition of Joshua Jack ("Jack Dep.") 46:10-7:24; Curley Dep. 2, 213:9-22.

Mart raised these concerns to Jack, Doyle's direct report, who notified Doyle and Curley. Doyle Dep. 178:13-180:10; Jack Dep. 13:5-8; 46:10-47:24. Jack told Curley that Mart might ban Galderma from the Ada West office. Jack Dep. 48:24-49:15. Doyle admitted that Mart asked that Doyle no longer go into the office (Ryan Decl., Curley Dep. 2, 212:21-4), indicating it was not Curley who suggested that Doyle no longer accompany Jack on his ADA West visits. Doyle understood that Ada West no longer wanted him to come to their offices. Doyle Dep. 178:13-180:10. Curley spoke to Mart on the phone in early March 2019. Curley Dep. 2, 213:6-13; Ryan

Decl., ¶ 8, Ex. G, Third Deposition of Ken Curley, December 9, 2020, Vol. I ("Curley Dep. 3") 49:4-53:7; Ex. 20, 21.

During Curley's call with Mart concerning the Ada West staff concerns, Mart conveyed that the complaints were based on Doyle's behavior and that Jack did not present an issue. Curley Dep. 2, 212:15- 213:5; Curley Dep. 3, 55:1-6; 56:22-57:3; Jack Dep. 51:3-20. During that call, Mart asked that Doyle no longer go into the Ada West office (Curley Dep. 2, 212:21-5) and Curley agreed. Jack Dep. 51:3-20.

Doyle testified in his deposition that Curley told him during his PIP about the complaint by Ada West and that Ada West did not want him to come to their offices. Doyle Dep. 177:25-178:15. Doyle said he'd already known about it because Jack had told him the day after their visit to Ada West. *Id.* 178:13-180:10.

### 3. Doyle's Reports Issue Complaints Against Him.

Beginning in 2015 and continuing through Doyle's PIP, a number of Doyle's direct reports raised complaints about him. In 2015, Doyle received feedback from his subordinates that he memorialized in a document called "Stop…Start…Continue…For Ian Doyle." Doyle Dep. 49:2-20; 53:24-54:17; Ex. 6. The feedback included, *inter alia*, that Doyle needed to stop "aggressive office behavior (leaning forward into personal space)," to "stop being condescending," to stop smoking on ride-a-longs, and to stop cancelling field rides the day before. *Id.*, Ex. 6. As early as 2016 and 2017, Doyle had a reputation "of not working or routinely canceling field rides with his representatives" and one of his direct reports wondered "how long can somebody continue to fail to ride with his sales representatives and get away with it." Ryan Decl., ¶ 14, Ex. M, Declaration of Mark Reynolds ("Reynolds Decl."), ¶ 4. Doyle also objects that Reynolds never complained orally or in writing to Curley about any alleged poor work performance by Doyle.

In April 2018, Eric Olsen, who reported to Doyle for four years, told Curley during his exit interview that Doyle did not give him any reason to stay, that he could "count on [his] hands the times he had ridden with [him] in the field," that clients did not respond well to Doyle's style and that certain places "didn't want him there because he would smell like smoke, talk too close, and be too assertive." Ryan Decl., ¶ 15, Ex. N, Declaration of Eric Olsen ("Olsen Decl."), ¶¶ 6-7;

15

United States District Court
Northern District of California

Ryan Decl. ¶ 16, Ex. O, January 27, 2021 Deposition of Eric Olsen ("Olsen Dep.") 16:15-17:5; 19:19-20:14; 23:20-24:18; 30:15-21; 31:2-14; 31:8-32:7; 32:16-33:2; 33:9-23. Olsen stated that this reflected his own feelings and his overall interaction with Doyle over the course of his employment. *Id.* Doyle objects that he performed satisfactorily as Mr. Olsen's supervisor. He dismisses the feedback from two former supervisees because they didn't report the problematic behavior to human resources.

In early 2019, Boyd shared with Curley that Doyle was not respecting his team. Boyd Decl., ¶ 10. Boyd brought this up to Curley as they were speaking about the morale of the team and "how [they were] not allowed to have ownership of [their] territories." Boyd Dep. 73:7-16. Boyd said he believed that Doyle's termination was overdue. Boyd Decl., ¶ 14. Doyle discounts the declarations of Olsen and Boyd because they weren't written until later.

More complaints regarding Doyle's behavior reached Curley in January 2019. One of Doyle's direct reports, Bianca Palomino ("Palomino"), complained to Curley about Doyle's lack of coaching, canceled field rides, and the fact that it was difficult to take Doyle into customers based on feedback she received from customers and Doyle's assertiveness. Curley Dep. 1, 122:5-123:11. Doyle admits this fact, but again discounts the complaints because he was never informed about this complaint, and never received any discipline related to it. Curley shared Palomino's concerns with Collins and Flores when recommending the PIP. Curley Dep. 1, 122:5-123:11.

Nevertheless, Flores was so concerned about it that she flew to California to meet with Palomino and discussed her concerns about the time Doyle required her to spend on projects that did not support her development, Doyle's unavailability and constantly canceling field rides with her, and how Doyle interacted with client accounts. Flores Decl., ¶ 7. Doyle denies "that he supervised Ms. Palomino poorly" and asserts that "Ms. Flores never informed him of Ms. Palomino's concerns, nor did she provide any discipline to him." Doyle Decl. ¶ 13; Flores Dep. 91:7-10.

In March 2019, during the pendency of Doyle's PIP, another of Doyle's direct reports, Cheri Waddell-Zornes, emailed Flores to raise concerns about Doyle's leadership, pointing out several instances in which she felt Doyle did not provide proper leadership. Flores Decl., ¶ 8 Ex.

16

E; Flores Dep. 98:17-100:4. Doyle responds again by denial, disagreement, and discounting the complaints. Doyle Decl. ¶ 14; Curley depo Ex. 7.

### H.    Doyle Failed to Achieve All PIP Deliverables

Doyle failed to meet two of the five deliverables in his PIP and needed help to reach others. For PIP Deliverable 2, Doyle was only able to achieve call cycle attainment of 75%, reduced from the 80% standard for all other RSMs, with Curley's intervention. On April 5, 2019, Curley sent an email to Doyle informing him that he had reached PIP Deliverable 2, 75% call cycle coverage in Q1 2019. Supplemental Declaration of Ken Curley ISO Reply ("Supp. Curley Decl."), ¶3, Ex. A. Doyle only reached 75% call cycle coverage after Curley removed the remaining call cycle targets for Palo Alto Medical Foundation ("PAMF") from his San Francisco region. *Id*. If Curley had not removed the remaining PAMF targets, Doyle's call cycle coverage would have been 72%. *Id*. At 75%, Doyle was behind the average for the West Area, which was 78% call cycle coverage. *Id*.

For Doyle's sales program executions, PIP Deliverable 5, Doyle completed part of the requirements but failed to meet the average number of 1.6 attendees for Expert On Demand programming in Q1 2019. Doyle Dep. 162:8-16.

For PIP Deliverable 1, Doyle failed to meet his sales attainment quota for any of the three products he sold in Q1 2019. Flores Dep. 105:6-110:1. In fact, Doyle's sales performance against quota for each of the three months of the PIP and for the entire Q1 2019 was the worst in the nation when compared to all other RSMs and Senior RSMs in the Rx Business Unit. Doyle himself calculated his own average sales attainment for all three products he sold at only 94.53%, while the national sales average for Q1 2019 was 104.95%.

Throughout his PIP and until at least April 12, 2019, Doyle had access to weekly sales results showing his progress towards his sales deliverable for the quarter. Doyle Depo 168:15-169:6. Doyle himself made use of this data to communicate to Curley in two different written progress reports, first on March 1, 2019, second on March 22, 2019, a week before the end of the measurement quarter, that his San Francisco region would miss the total prescription goal in Q1. Doyle Dep. 154:11-155:18; 156:4-157:6; 157:23-158:7; Ex. 19, Ex. 20. So, as early as a week

before the end of the Doyle's PIP, Doyle knew that he would not meet the sales deliverables of his PIP – and Curley knew because Doyle himself had made that clear. Based on this same weekly sales data, Moseley also knew that Doyle failed to meet his Q1 sales quota deliverable.

**I.      Decision to Terminate Doyle and Timing of the Final Q1 2019 Integrated Report**

Because the date to determine whether Doyle met PIP Deliverable 1 is the release of the Final Q1 2019 Integrated Report, Doyle goes to great lengths to describe the carefully monitored, step-by-step process completed by Moseley. Moseley depo 38:6-41:11; 65:13-67:15. Step 1 is to receive the company-wide sales information from Beghou, an outside vendor, which happens approximately two weeks after the last day of the month. Step 2 is for Moseley to personally validate this information using Galderma's Access Database to review the sales information in the company's data warehouse. Moseley "pulls" the data units for each Galderma territory using the same "frozen alignment" to "make sure that the number of units that Benghou has in their attainments is the correct number of units." *Id.* Moseley does this territory by territory for the entire country. Step 3 is to send the draft report to the Vice President of Sales, in this case Collins, for "approval" and "to see if [he has] any questions." *Id.* Step 4 is the report is finalized and provided to Area Directors, such as Curley. *Id.*

This process makes it clear, then, that the final release of the Integrated Report confirms sales data already known to Galderma. The report formalizes and finalizes this data into a report used to pay sales commissions. The data for the Integrated Report is received at Step 1 so the final report is not required to determine where sales representatives fall in meeting their quota.

Nevertheless, Moseley testified at her deposition that by the final work day of Q1 2019, Friday, March 29, "the normal weekly report would have been available, and since those numbers don't increase over a weekend that I have ever seen, then we would have known - - at the time of my meeting with [Flores], we would have had the information March 29, 2019, so we would have had a really good estimate at that point." Moseley Dep. 77:12-18.

Flores took over management of Doyle's PIP from King in April 2019. Flores Dep. 121:18-122:16; King Dep. 118:15-119:19, Ex. 14. In transitioning the handling of Doyle's PIP to Flores, King noted the plan to confirm Doyle's final sales numbers with Moseley. King Dep.

113:5-114:22, Ex. 13. Flores indicated that, as of April 9, 2019, Curley had not made the decision to terminate Doyle and that they were planning a close out of the performance improvement plan. Wallace Decl., ¶12, Ex. 11, November 19, 2020 Deposition of Edith Flores ("Flores Dep.") 119:17-25.

On April 17, 2019, Flores reviewed the Q1 sales results data with Moseley. Flores Dep. 105:6-110:1. By then, Moseley testified, the numbers would still have been estimates but, she added, "Neither one of the numbers would have gone up. The national attainment would not go up and individual attainments would not go up after my meeting with [Flores] on April 17th." Moseley Dep. 77:20-23.)

At this meeting, Moseley confirmed to Flores what Doyle had already told Curley on March 1 and 22, 2019 would be the case: that his San Francisco region would miss the total prescription goal in Q1. Doyle Dep. 154:11-155:18; 156:4-157:6; 157:23-158:7; Ex. 19, Ex. 20. Indeed, Doyle failed to reach 100% of his sales quota for Q1 2019 (Doyle Dep. 185:14-17) and failed to meet the sales attainment deliverable for all three products he sold in Q1 2019. Flores Dep. 105:6-110:1. Moreover, he had the lowest quota attainment in the nation for each month of Q1 2019 and for the entire Q1 2019 when compared against all other RSMs and Senior RSMs in the Rx Business Unit: "Overall he was ranked six of six as it compares to the area sales managers for January, February, and March. And he was behind the goal between - - once again, as stated previously around 10 or 11 percent of forte [sic], around 10 percent with cilantro [sic] and around 8 percent with aracea [sic]." Curley Dep. 1, 158:6-16; Curley Decl., ¶12. Doyle's sales performance against quota got worse from January to February 2019 – after Galderma placed Doyle on a PIP. Curley Decl., ¶11, Ex. F.

Doyle's overall attainment for Q1 2019 was either 95.14%, as calculated by Galderma (Curley Decl., ¶ 12) or the lower figure 94.53% asserted by Doyle[1] (Wallace Decl. ¶ 4), while the national sales average for Q1 2019 was 104.95%. Ryan Decl., ¶ 17, Ex. P, Galderma's Responses

---

[1] Galderma stipulates to the lower figure put forward by Doyle but points out that this number, like most of the other sales percentages used by Doyle in his Opposition, come from his attorney's calculations. *See* Reply to Opp. to UMF #124.

to Request for Production, Set Five.  Doyle tries to create a "dispute" by saying that he can't confirm the national sales average, but he presents no evidence to contradict it.  In addition, Galderma, in its Reply, confirmed that he actually does have this data as part of the final Q1 2019 Integrated Report, which was produced during discovery.  Supp. Ryan Decl., ¶ 8.

After confirming with Moseley that Doyle had fallen short of both his quota and the national sales average, Flores reported that information to Curley.  Flores Dep. 110:15-19.  On or about April 17, 2019 – after Flores confirmed with Moseley Doyle's sub-quota sales results and reported this information to Curley – Curley made the decision to terminate Doyle.  Supp. Ryan Decl. ¶ 5, Ex. C. Def's Supplemental Response to First Set of Special Interrogatories No. 4. Curley asked Human Resources to verify all metrics and "it was verified that he missed his quota of 100% at national average."  Wallace Decl., Curley Dep. 1, 154: 8-15.

The decision to fire Mr. Doyle was made by Mr. Curley, with approval from Mr. Collins, his direct superior, and Flores.  Curley depo 34:12 - 35:6.  Collins testified that he approved Doyle's termination after Curley recommended it.  Collins Dep. 77:6-22; Curley Dep. 1, 34:6-16. Prior to terminating Doyle, then, Galderma confirmed that Doyle had not meet his sales quota for Q1 based on sales data it had received prior to the release of the Integrated Report.  Flores Dep. 102:2-106:22; Flores Decl. ¶ 9; 3rd Curley Dep. 81:5- 16.

On or about April 17-18, 2019, Flores and Curley prepared talking points to discuss with Doyle at his termination meeting.  Flores Dep. 124:6-19.  The talking points for Doyle's termination indicate that Doyle did not meet two of his PIP deliverables.  Supp. Ryan Decl., ¶ 6, Ex. D, December 9, 2020 Deposition of Ken Curley ("Curley Dep. 3") 82:7-88:13, Ex. 26.

Doyle contends that since the due date for PIP Deliverable 1 was "Release of Q1 Integrated Report" and the report was not released April 23, 2019, the day after he was fired, Galderma could not have determined whether Doyle met this PIP goal before firing him.  But Moseley specifically testified that the Integrated Report was the final report that "sales commissions are based off of," that Galderma makes "payments based off of their final attainments, final confirmed attainments, which is what the integrated report is," and the "integrated report is used to determine what the commission payments need to be."  Wallace

20

Decl., Moseley Dep. 37:9-12; 44:14-18; 44:25-45:8.  Nevertheless, Moseley was firm that, although the Q1 2019 Integrated Report had not been verified for purposes of calculating commissions, Galderma had access to the data needed for purposes of seeing whether Doyle met his quota.  Supplemental Declaration of Ryan ISO Reply ("Supp. Ryan Decl."), ¶ 4, Ex. B, Moseley Dep. 67:16-69:1; 69:12-21; 72:4-74:3; 77:10-78:7.

Galderma terminated Doyle's employment on April 22, 2019.  Doyle Dep. 182:19-183:3. Flores attended the April 22, 2019 termination meeting with Doyle and Curley over the phone. Doyle Dep. 183:13-16.

Doyle complains that "no one at Galderma, not Mr. Curley, not Mr. Collins, not Ms. Flores, ever informed Mr. Doyle before he was fired whether or not he actually met the PIP deliverables."  However, Galderma produced an email Curley wrote to Doyle prior to his termination indicating to Doyle that he met his call cycle attainment of his PIP.  Supplemental Declaration of Ken Curley, ¶ 3, Ex. A.  Curley testified that he told Doyle that he did not meet the deliverable of executing at least two acne LCD speaker programs.  Wallace Decl., Curley Dep. 331:19-23.  And, as stated above, Doyle himself informed Curley that he had not met his sales performance deliverable.

During the meeting, Curley informed Doyle that he was being terminated because had not met 100% of his sales performance quota or the national average, PIP Deliverable 1, and the Peer to Peer requirement, PIP Deliverable 5, and because of recent customer complaints and the fact that he had lost the trust and confidence of his team.  Supp. Ryan Decl., ¶ 3, Ex. A, Deposition of Ken Curley Vol. I 155:13-156:3.

**J.     Termination Form Lists "Retirement" not "Released for Cause"**

Galderma completed a termination form, signed by Flores, Curley and Collins, listing "retirement" not "terminated for cause" as the reason for Mr. Doyle's dismissal.  Flores depo 134:25-135:21, Ex. 18.  Flores stated that Galderma classified Doyle as a retiree in his separation documentation solely to facilitate the processing of the retiree medical benefits and reserve leave to which he was entitled.  Flores Dep. 133:12-136:21.  King stated that Doyle "was terminated for performance.  I don't know why it shows voluntarily resignation – retirement, maybe for benefits

21

eligibility."  Ryan Decl, ¶ 7, Ex. F, King Dep. 138-5-9; Errata.  Doyle contends that he "cannot speculate why Mr. Curley, Mr. Collins and Ms. Flores all signed their names on a Termination Form which indicates that Mr. Doyle retired" (citing King Dep. 136:16-138:9).

**K.      A 27-Year-Old Is Hired to Take The RSM Position Vacated By Doyle**

On June 6, 2019, Ms. Jordan Miller, age 27, took over Doyle's former position as RSM for the San Francisco region.  Wallace Decl. ¶ 6; Defendant's Suppl. Resp. To Sp. Interrog. Nos. 7-9.

**L.      Doyle's Comparables**

Doyle asserts that younger Galderma employees who performed below expectations were not disciplined or terminated.  He argues that the Q1 2019 Integrated Report shows that Ms. Kelly Adams, age 33 at the time, Doyle's colleague who worked as an RSM for the Los Angeles territory and also reported directly to Curley, failed to meet her Q1 2019 sales quota, achieving a 99.25% rate out of 100%.  Doyle cites to Curley's deposition to assert that Adams "received no discipline of any kind," but actually Curley said only that Adams was not put on a PIP.  Wallace Decl. ¶ 4, Curley Dep. 340:6-8.  Doyle provides no other evidence that he and Adams were similarly situated, *i.e.*, that there were customer and team complaints about Adams, nor evidence that she was not otherwise disciplined.

Doyle asserts that "his far-younger peers in the West region, working for the same manager during the preceding 12 months" performed worse in Q2 and Q3 2018 – Ruben Gonzalez, Holly Fitzhenry, Peterson Frey, and Kelly Adams – than he did in Q1 2019.  Doyle asserts that he "personally know[s] that none of these individuals received any discipline for their quarterly scores."  Doyle Decl. ¶ 21.

Doyle also claims that two Galderma employees had a full year of performance below Doyle's Q1 2019 results – Jeff Paulson (36), 94.06% in 2017and Jonathan Brisson (35) 93.15% in 2016.  Wallace Decl. ¶ 4.  Ironically, the evidence Doyle himself submits further distinguishes Brisson as a comparator because Brisson was not managed by Curley at that time and he worked in the CentralSouth region, a different area from Doyle.  In addition, he attained 99.68% of quota by the end of the following year.  Wallace Decl., ¶ 4, Galderma's Integrated Reports for 2016-2019.

Doyle points to three RSM he characterizes as "bottom-performers" in prior years who were significantly younger than Doyle whom he claims received no discipline at all: "Jeff Paulson (36) Rank 7th out of 7 – 2017; Brenda DeHart (45) Rank 9th out of 9 – 2015; Pete Julian (33) Rank 8th out of 8 – 2012." Wallace Decl. ¶¶ 2-4, 10; Defendant's Responses to Second Set of Requests for Admission Nos. 12, 17, 18. However, Galderma submitted evidence that, though not placed on a PIP, Paulson's role was terminated as part of a reorganization where performance was a factor in selecting employees for elimination. Wallace Decl., ¶ 10, Ex. 9 Defendant's Responses to Request For Admissions, Set Two, No. 18. Galderma only indicated that Julian was not put on a PIP or terminated in 2012, not that he received no discipline at all. Wallace Decl., ¶ 10, Ex. 9 Defendant's Responses to Request For Admissions, Set Two, No.12. Galderma points out that Doyle's assertion that DeHart was 9 out of 9 in 2015 is not supported because the document used does not include year-end rankings (Wallace Decl. ¶ 3, Ex. 2) and he does not provide a cite to DeHart receiving "no discipline at all."

Doyle also asserts that two of his younger peers were also under quota for 2018 and neither of them was disciplined: "Matt Chierchie (36 yrs. old) 95.00 in 2018; Kelly Adams (32 yrs. old) 94.99 in 2018." Wallace Decl. ¶¶ 4, 10; Defendant's Responses to Second Set of Requests for Admission No. 20, 22. Doyle's counsel admits that he made the quota calculations himself based on information provided to him by Galderma, but he states no expertise or other basis on which he can substantiate the results he came up with. Again, Doyle does not provide a cite to the ages of Chierchie or Adams and again he misstates the evidence to which he cites. Though Chirechie was not put on a Performance Improvement Plan or terminated in 2018, Chierchie was never managed by Curley (Wallace Dec., ¶ 10, Ex. 9 Defendant's Responses to Second Set of Request for Admission No. 20), but worked instead in the East Area of the Galderma Rx Business Unit. Wallace Decl., ¶ 4, Ex. 3.

**M.      Doyle Has Provided No Direct Evidence of Discriminatory Motive**

Doyle admits all of the following in his deposition: that Curley never said anything to Doyle that would cause Doyle to have a reason to believe that Curley wanted him terminated because of his age (Doyle Dep. 138:7-9), that Curley never made a comment about Doyle's age or

anyone else's age (Doyle Dep. 140:1-9), and that Curley never asked when Doyle might retire. Doyle Dep. 142:6-9. Doyle also admits that he never raised any concerns to anyone at Galderma about his performance management or termination until retaining counsel, after his termination.

### III.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party opposing summary judgment must, in a manner "as would be admissible in evidence," set forth "specific facts showing that there is a genuine issue for trial." Federal Rule of Civil Procedure 56(e). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.,* 363 F.3d 916, 922 (9th Cir. 2004).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). Hence, a court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. Where the moving party will have the burden of persuasion on an issue at trial, it must "support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id*. at 331. On an issue for which the opposing party will have the burden of proof at trial, however, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

It is not the task of the Court to scour the record in search of a genuine issue of triable fact.

24

United States District Court
Northern District of California

1  *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996).  Rather, the Court relies on the nonmoving

2  party "to identify with reasonable particularity the evidence that precludes summary judgment."

3  *Id.*  Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine

4  issue of fact, where the evidence is not set forth in the opposing papers with adequate references

5  so that it could conveniently be found."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d

6  1026, 1031 (9th Cir. 2001).  "Judges are not like pigs, hunting for truffles buried in briefs."

7  *Christian Legal Soc. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010).  If the nonmoving party fails to

8  identify such evidence, or if it offers evidence that is "merely colorable, or is not significantly

9  probative, summary judgment may be granted."  *Anderson,* 477 U.S. at 249-50 (citations omitted).

## IV.    DISCUSSION

### A.    First Cause of Action: Age Discrimination in Violation of FEHA

12        California has adopted the three-stage burden-shifting test for trying claims of

13  discrimination, including age discrimination established by the United States Supreme Court in

14  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Guz v. Betchel Nat'l, Inc.,* 24 Cal. 4th

15  317, 354-56 (2000); *see also Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112, 1118

16  (9th Cir. 2011) (applying burden-shifting analysis to wrongful termination claim based on age

17  discrimination in violation of FEHA and public policy).  Under this test, the plaintiff bears the

18  initial burden of establishing a *prima facie* case of discrimination; the employer then must offer a

19  legitimate, nondiscriminatory reason for the adverse employment decision; finally, the plaintiff

20  must prove, by specific and substantial evidence, that the employer's proffered reason was

21  pretextual.  *McDonnell Douglas*, 411 U.S. at 802-03; *Horn v. Cushman & Wakefield Western,*

22  *Inc.*, 72 Cal. App. 4th 798, 806-807 (1999) ("a plaintiff alleging discriminatory termination under

23  California's anti-discrimination statutory scheme must be able to survive the burden-shifting

24  analysis set forth by the Supreme Court in *McDonnell Douglas*").

25        "[T]he plaintiff in an employment discrimination action need produce very little evidence

26  in order to overcome an employer's motion for summary judgment."  *Santillan v. USA Waste of*

27  *Cal., Inc.*, 853 F.3d 1035, 1042 (9th Cir. 2017).  However, "[t]he ultimate burden of persuading

28  the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all

times with the plaintiff." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

"To prevail on summary judgment, an employer must show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment." *Lawler v. Montblanc N. Am., LLC,* 704 F.3d 1235, 1242 (9th Cir. 2013).

In the instant case, summary judgment is warranted for two reasons: (1) Doyle has not presented sufficient evidence to establish a *prima facie* case and (2) Galderma has presented legitimate, nondiscriminatory reasons for the termination and Doyle has not demonstrated that those reasons were pretextual. Doyle has demonstrated no genuine dispute of material fact requiring trial on any of these issues.

### 1. Step One: Doyle Cannot Establish a *Prima Facie* Case of Age Discrimination

To avoid summary judgment, Doyle must first establish a *prima facie* case of age discrimination in violation of FEHA by proving that: (1) he belongs to a protected class; (2) he was performing satisfactorily in the position held; (3) he suffered an adverse employment action; and (4) some other circumstances suggesting a discriminatory motive. *Guz*, 24 Cal. 4th at 355.

The requirement to establish a *prima facie* case is "designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class or was clearly unqualified . . ." *Id.* at 354. This initial burden is not an insubstantial one – the *prima facie* case must be supported by evidence that gives rise to an inference of unlawful discrimination. *Phipps v. Gary Drilling Co.*, 722 F. Supp. 615, 619 (E.D. Cal. 1989). "While the plaintiff's *prima facie* burden is not onerous, he must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion . . ." *Guz*, 24 Cal. 4th at 355 (citations omitted).

Doyle easily satisfies the first and third prongs of his *prima facie* case in that (1) he was sixty-four years old and therefore part of a protected class of people over forty, when (3) he was terminated from his job. However, he is unable to satisfy either of the other two prongs.

**a.      Second Prong: Doyle Does Not Carry His Burden to Show He Was Performing His Job Satisfactorily[2]**

Doyle's *prima facie* case fails first because he cannot show he was "performing satisfactorily in the position held."  To be considered qualified for a job, a plaintiff must prove he "was doing [his] job well enough to rule out the possibility that [he] was fired for inadequate job performance."  *Sengupta v. Morrison-Knudsen Co., Inc.,* 804 F.2d 1072, 1075 (9th Cir. 1986).  This Doyle has not done.

Doyle makes only the most cursory attempt to establish this crucial element of his *prima facie* case,  He blandly comments, "Plaintiff submits that he has also presented evidence sufficient to raise a triable issue of fact that he was performing his job competently (See detailed Timeline and Statement of Facts above)."  Opp. p. 19.  But in this, he is mistaken.

With respect to the relevant time period, Doyle has not proved – nor, again, does it seem he's tried hard to prove – that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance.  He attaches to his deposition a smattering of awards and a history of raises throughout his time at Galderma and commission payments up to his termination in 2019.  Doyle spends only a single paragraph to list the more positive aspects of his performance. *See* Opp. p. 19.  But this litany ignores the very components about which Galderma warned him and for which he was eventually fired.  *See* IV.A.i.a(i)-(iii) *infra*.  Doyle cannot simply ignore facts he finds not to his liking and claim to be performing well.

The Court will not generate material disputes *sua sponte*.  As colorfully articulated by the 9th Circuit, "Judges are not like pigs, hunting for truffles buried in briefs."  *Wu,* 626 F.3d at 488 (9th Cir. 2010).  Despite bearing the burden of proof at this stage, Doyle has submitted evidence that is at best "merely colorable," not probative.

Although Doyle's failure in this respect could end the analysis here, the Court will nevertheless examine the ample record evidence that Doyle manifestly failed to perform his job satisfactorily.  Doyle's poor performance included: (i) inadequate sales results in 2018 that

---

[2] As will be evident below, the *McDonnell Douglas* requirement that plaintiff perform the job in a satisfactory manner "ties in to the express statutory 'good cause' defense and defendant's business justification for its decision."  *Phipps,* 722 F. Supp. at 620.

United States District Court
Northern District of California

culminated in his being put on a PIP in Q1 of 2019 and that did not improve during his PIP, (ii) complaints about his behavior from customers during the course of his PIP, and (iii) complaints about his behavior lodged both during and before his PIP by Galderma employees whom he was supposed to supervise. Doyle's performance issues are detailed above, but certain facts bear reiteration.

**i.**      **Doyle's History of Poor Sales Performance and Failure to Meet PIP Deliverables**

The single most salient undisputed fact, supported by Doyle's own testimony and evidence, is that Doyle's sales performance dropped measurably during his final three to five years and then it fell ever more precipitously during the last fifteen months of his employment. The fact that Doyle included in his Timeline and Statement of Facts performance results and awards since he was hired in 1989 indicates that he believes this information is relevant to this lawsuit. It is not.

As Doyle himself stated in his deposition, the most important metric of job performance for RSMs is their sales results. He also acknowledged that performing above goal with key brands and increasing share with promoting strategic topical products was a goal for him every year.

In the years 2014, 2015, 2017, and 2018, Doyle received a rating of "developmental opportunity" for sales achievement and, in 2018, for Overall Contribution he received a rating of "Needs Improvement," the lowest rating possible on Galderma's assessment scale, which means that Doyle did not meet the expected requirements of the position. Specifically, Doyle admitted in his deposition that, through May 2017, he performed at only 85% of quota with the product Soolantra and below target with the other two products he promoted, Tri-Luma and Epiduo, and he acknowledged that his sales rating as a "developmental opportunity" was not unfair and that he needed to improve his results.

It appears, however, that 2018 was an even worse year for Doyle's sales performance. In Doyle's Mid-Year Review, Curley warned him that, based on the first half, he could end the year with an overall "Needs Improvement" rating, the lowest rating possible on Galderma's assessment scale and one that meant he was not meeting the expected requirements of his position. Doyle confessed that he also did not consider this mid-year review unfair. In June 2018, Doyle met with

Curley one-on-one, after which Curley sent him an email reiterating that "[f]ailure to hit these [sales] metrics will result in a more formalized improvement plan being put in place." As Doyle understood this message, he'd be put on a PIP if he didn't improve.

Despite Curley's clear early warnings, Doyle's 2018 rating for Overall Contribution Assessment was, in fact, the lowest possible rating of "Needs Improvement," which Doyle also admitted in his deposition was fair. Doyle backpedals from this admission in his declaration in an attempt to create a factual dispute, claiming that he was unaware of other Galderma employees' performances at the time of his deposition. This attempt to create a dispute fails in light of Galderma's evidence showing that, before his deposition, Doyle had access to his area's records for 2014 through February 2019.

Doyle points to his 2018 ratings of "Strength" or "Meets Expectations" for areas unrelated to sales – namely Courage and Integrity, Collaboration, Impact and Influence, Organizational Sense, Innovation, Team Leadership, and Change Leadership – to show that he was performing satisfactorily in the position held. But these non-sales results, even when rated as "Strength," do not negate evidence of poor sales performance. They also did not prevent him from being placed on a PIP, as Galderma sought satisfactory sales performance from Doyle as a sales professional.

At the end of 2018, Doyle's region ranked last in sales performance attainment for all six regions of the West area, last of all eighteen regions of the Rx Business Unit across the United States, and last in the nation for all Q4 prescription contests. Doyle had failed to meet his sales quota in any of the three products he promoted, reaching only 94.22%, a quota he testified he had helped set with Moseley and that he felt was fair.

Doyle disputes Galderma's assertion that his region performed the worst in the country for performance on the MBO metrics – the fact that his field coaching reports were below objective for all quarters, his call cycle attainment was below objective for all quarters, and he underinvested resources – arguing that there is no evidence of MBO metrics rankings nationwide. Viewing evidence in terms most favorable to the nonmoving party, the Court will disregard commentary about ranking of MBO metrics, finding that even if Doyle's results in this area were disputed, it is not material to Galderma's assertion that Doyle was terminated in large part for his

failure to meet other metrics, most prominently sales results, in his position as RSM.

Also despite Curley's June 2018 warnings, Doyle's poor performance earned him a PIP for the first quarter of 2019, an action Doyle admitted at his deposition he did not think was unfair. Doyle understood, too, that failure to meet his PIP goals could result in termination. Curley was unequivocal about his reasons for placing Doyle on a PIP: sales performance, coaching of his team members, an increased need for investment of resources, specifically based on the first half of 2018, inability to keep call cycle attainment, ranked 18 of 18 for the year out of sales managers.

Though Doyle contends the opposite, email correspondence between Curley, Doyle and other RSMs that was produced by Galderma demonstrates that (1) Doyle knew about most of the expectations that were included in his PIP no later than December 2018 and early January 2019 and (2) the performance expectations contained in Doyle's PIP were consistent with existing expectations for all other RSMs and Senior RSMs under Curley. This includes PIP Deliverables for MBO goals, extended selling and execution of sales programs, and Peer to Peer educational events. He was already aware of his sales attainment quota, which he and Moseley worked on together. Plus, Doyle admits that Curley had previously counseled Doyle on many issues contained in the PIP.

Despite all this, by the end of Q1 2019, Doyle failed to meet two of the five deliverables in his PIP. Besides failing to meet his sales program executions, PIP Deliverable 5, for Galderma's acne product line, Doyle crucially failed to meet his sales attainment quota, PIP Deliverable 1, for *any* of the three products he sold in Q1 2019. In fact, Doyle's sales performance against quota for each of the three months of the PIP and for the entire Q1 2019 was *once again* the worst in the nation when compared to *all* other RSMs and Senior RSMs in the Rx Business Unit. Doyle himself calculated his own average sales attainment for all three products he sold at only 94.53%, while the national sales average for Q1 2019 was 104.95%. Doyle "disputes" the national sales average because he says he can't confirm it, but he presents no evidence to contradict it. Also, Galderma confirmed that Doyle does have the data as part of the Q1 2019 Integrated Report, produced during discovery.

In the face of overwhelming evidence of unsatisfactory job performance, Doyle advances

two main arguments to try to create factual disputes: that in the past he received positive evaluations, promotions, pay raises, and awards, and that he received sales performance commissions, also called bonuses, during the period Galderma found his sales performance lacking.

### (a) A History of Positive Evaluations Does Not Insulate Doyle From Subsequent Findings of Poor Performance

Although, as noted above, demonstrating that a *prima facie* case has been made is a minimal burden, "plaintiff must come forward with some showing that his work was being performed in a competent manner." *Sneddon v. ABF Freight Systems*, 489 F. Supp. 2d 1124, 1129 (S.D. Cal. 2007). Previous good to average performance evaluations do not insulate an employee from later poor evaluations. *Id.*

Doyle appears to think that past good performance evaluations serve as a defense against current bad performance. However, in *Sneddon*, the Court found that ratings of "meets or exceeds expectations" in some categories even as recently as one or two years "does not demonstrate that plaintiff's performance was necessarily adequate or competent" in the present. *Id.*

Despite Doyle's apparently laudable past performance and awards during his employment with Galderma, he is still subject to termination for poor performance later in his career. Viewing Doyle's work history and construing all inferences in the light most favorable to Doyle, positive performance reviews in the past are insufficient to prove that Doyle was doing his job well enough to rule out the possibility that he was fired for inadequate job performance.

### (b) Galderma Presented Undisputed Evidence That Sales Performance Commissions, Also Called Bonuses, Do Not Equate to an Endorsement of His Performance

Whereas Doyle has failed to produce evidence that sales commission (or bonus) payments demonstrate satisfactory work performance, Galderma has shown that such payments do not serve as an endorsement of sales results.

Doyle repeatedly asserts that his sales bonuses of $59,243 in 2016, $71,252 in 2017, $78,580 in 2018, and $11,500 in Q1 of 2019 prove he was not a poor performer. However,

Moseley's uncontroverted testimony established that such payments are "based on the amount of units sold and are made even when a sales employee does not meet their quota or is a bottom performer" and do "not equate to excellence in sales." Even if this were not true, Doyle's receipt of sales commissions does not negate undisputed evidence of his poor performance against quota and the fact of his last-place ranking in the nation in the Rx Business Unit in 2018 and Q1 2019. Thus, payment of a sales commission does not create a dispute of material fact as to his performance.[3]

Doyle failed to demonstrate any genuine issue of material fact that he was performing satisfactorily in his position as RSM. Undisputed evidence of over two years of poor *sales* performance as a Regional *Sales* Manager prevents Doyle from establishing a prima facie case of discrimination. Hence, Doyle failed to show that he was performing his job well enough to rule out the possibility that he was fired for inadequate job performance.

### ii.    Customer Complaints

Courts in the Ninth Circuit have regularly found that terminating an employee's employment because of customer complaints is in itself a legitimate nondiscriminatory reason for terminating employment. *See, e.g., Parks v. Bd. of Trs. of Cal. State Univ.*, 813 F. Supp. 2d 1182, 1194–95 (E.D. Cal. 2011) (granting defendant's summary judgment motion for plaintiff professor's claims for, *inter alia*, age discrimination under FEHA where disciplinary action was based on complaints by students).

During Doyle's PIP, Galderma received two complaints from customers who found Doyle's behavior so egregious that they did not want him ever to return to their facilities. In January 2019, Curley learned of the first complaint that Seattle-area dermatologist Dr. Liu had barred not just Doyle, but Galderma as a company, from his office because he was so angry about Doyle's behavior during a November 2018 visit to Dr. Liu's office. In March 2019, Dr. Liu demanded that Curley make an in-person apology to him and his wife for Doyle's behavior and, in

---

[3] Doyle also argues that receipt of sales commission payments is proof that his termination was pretext for discrimination. This argument is equally unavailing in that context so the Court will not repeat its analysis below.

April 2019, Curley flew from Texas to Seattle to apologize in person for Doyle's behavior.

Doyle dismisses the complaint against him by Dr. Liu in November 2018 by saying that neither he nor his colleague Gonzales thought Doyle was being aggressive. Doyle's testimony that "nothing had happened" during the visit to Dr. Liu's office and that he was "flabbergasted" by Ada West's complaint does not change the fact that Doyle engaged in behavior that was extremely inappropriate in the eyes of important Galderma clients resulting in customer complaints so serious that they disrupted Galderma's relationship with important sources of product sales and necessitated a personal trip by Curley from Texas to Seattle to apologize to Dr. Liu for Doyle's behavior.

In February 2019, Curley learned of a second complaint about Doyle's behavior from another customer, Ada West, Galderma's largest customer in Boise, Idaho. Multiple Ada West staff had complained to their office manager, Mart, about Doyle's overbearing behavior and invasion of office staff's personal space. Mart conveyed these complaints to Doyle's direct report, Jack, who notified Doyle and Curley about the situation and that Ada West was considering banning Galderma from its office because of Doyle's behavior. In early March 2019, Curley called Mart, who asked that Doyle no longer come to the Ada West office.

It should go without saying that it's irrelevant that Doyle disagrees with how the interaction was characterized but since Doyle argues that his subjective opinion somehow disputes the facts, the Court feels obligated to make this point. What's relevant here is the undisputed fact that two complaints were lodged against Doyle by Galderma customers – during the pendency of his PIP, no less – and that Doyle's behavior had serious consequences for Galderma's business. Both complaints involved Doyle, the manager in charge of the company's sales in an entire region, being barred from entry to the offices of Galderma's customers, one of which, Ada West, was Galderma's largest dermatology practice client in the Boise metro area. These complaints were of a serious enough nature for the reputation of Galderma and its ongoing relationship with and access to its customers that they necessitated personal intervention by Doyle's supervisor, Curley. Curley had to spend time to investigate the complaints and to get the customer relationships back on track, and Curley had to make a special trip from Texas to Seattle to deliver an in-person

apology demanded by the aggrieved customer in order to allow Galderma to return to these offices at all. Thus, the complaints impacted both Galderma employee time and its financial resources.

Similarly, Doyle's assertion that he received no written discipline for either incident does not constitute evidence that Galderma considered these minor matters, as written discipline is not required in order to demonstrate that an employer considers a customer complaint serious. In any event, Doyle's timeframe for recognizing causality is remarkably short, as his termination at the end of the very quarter in which these complaints came to light could easily be read – as indeed Galderma contends it was – as "discipline" for alienating its customers. There is no question that Galderma is entitled to discipline Doyle for the fall-out of his interaction with clients and such complaints are in themselves a legitimate nondiscriminatory reason for terminating employment.

Doyle has not created triable issues of fact as to whether he was performing his job in a satisfactory manner. Indeed, during a time when Doyle was already underperforming at his job, he was the subject of two separate and serious customer complaints.

This development changed the balance of factors in the evaluation of Doyle's performance. It bears repeating that two times in the three months of the PIP, Doyle's supervisor had to step in to repair a client relationship Doyle was on the verge of ruining for Galderma. Regardless of Doyle's opinion about his behavior, both customers found it so egregious that they never wanted Doyle to set foot in their offices again.

It is undisputed that customer complaints affected Galderma's perception of Doyle's ability to perform his job. Galderma considered Doyle's behavior part of his poor performance and was one of the reasons given for his termination.

### iii. Employee Complaints

During and before Doyle's PIP, multiple Galderma employees who reported directly to Doyle lodged complaints against him for, *inter alia*, his lack of supervision and unprofessional behavior. Beginning in 2015, continuing up to and through Doyle's PIP, a number of Doyle's direct reports raised complaints about him.[4] In 2015, a list of positive and negative behaviors

---

[4] Yet again, Doyle "disputes" these and other complaints against him by disagreeing with them. As with the customer complaints, it is immaterial whether Doyle agrees with the complaints by his

raised by his subordinates was compiled and memorialized by Doyle in a report called "Stop…

Start… Continue for Ian Doyle." The feedback included, *inter alia*, that Doyle needed to stop

"aggressive office behavior," to "stop being condescending," to stop smoking on ride-a-longs, and

to stop cancelling field rides the day before.

Many of his current and former reports had significant complaints about Doyle and

included them in their deposition testimony. Mark Reynolds, one of his direct reports, testified

that, as early as 2016 and 2017, Doyle had a reputation "of not working or routinely canceling

field rides with his representatives" and stated that he wondered "how long can somebody

continue to fail to ride with his sales representatives and get away with it." In April 2018, Eric

Olsen, who reported to Doyle for four years, told Curley during his exit interview that Doyle

"didn't give him any reason to stay at Galderma," that he could "count on [his] hands the times

[Doyle] had ridden with [him] in the field," that clients did not respond well to Doyle's style and

that certain places "didn't want him there because he would smell like smoke, talk too close, and

be too assertive." Olsen stated that this reflected his own feelings and his overall interaction with

Doyle over the course of his employment.

Even more employee complaints regarding Doyle's behavior reached Curley in January

2019. In early 2019, another of Doyle's direct reports, Brandon Boyd, shared with Curley that

Doyle was not respecting his team. Boyd brought this up to Curley as they were speaking about

the morale of the team and "how [they were] not allowed to have ownership of [their] territories."

Boyd stated he believed that Doyle's termination was overdue. Bianca Palomino, who also

reported directly to Doyle, complained to Curley about Doyle's lack of coaching, canceled field

rides, and the fact that it was difficult to take Doyle into customers based on feedback she received

from customers about Doyle's assertiveness. Curley shared Palomino's concerns with Collins and

Flores when recommending the PIP.[5] Flores took these complaints seriously enough to fly to

_____

subordinates, was informed of them, or was immediately disciplined in a manner he sees is linked
to them.

[5] Doyle "disputes" this fact by asserting that "Curley never included mention of Palomino's
complaint or any other complaint of any kind in the PIP." As with Doyle's response to other
complaints about him, this assertion does not serve to dispute the facts as stated.

California to discuss Palomino's additional concerns about the time Doyle required her to spend on projects that did not support her development, Doyle's unavailability and the fact that he constantly canceled field rides with her, and how Doyle interacted with client accounts. Also, during Doyle's PIP, in March 2019, yet another of Doyle's direct reports, Cheri Waddell-Zornes, emailed Flores to raise concerns about Doyle's leadership, pointing out several instances in which she felt Doyle did not provide proper leadership.

Doyle contends that he has created disputes of material fact because he disagrees with the complaints made by Olsen, Boyd, Reynolds, Palomino, and Waddell-Zornes, he was not informed of the complaints by the complainants or HR, and/or formal complaints were not made to HR. As with the customer complaints, he claims that he was not disciplined in a timeframe he recognized, adding that the complaints weren't mentioned in the PIP.

The fact that "Doyle vehemently denies all the insulting, untimely, inaccurate and irrelevant accusations included in the declarations of Mr. Boyd, Mr. Olsen, and Mr. Reynolds" does not, as he asserts, "thereby rais[e] a triable issues of fact." Doyle's opinion in a self-serving declaration asserting that he was a good supervisor is irrelevant. Subjectively disagreeing with the complaints and denying their veracity does not negate the fact that they were made and does not create a dispute warranting trial.

Doyle attempts to create a "dispute" about the complaints by Olsen, Boyd, Reynolds, Palomino, and Waddell-Zornes because they were not reported to him or to Human Resources. But Palomino did report her complaint to Flores. Doyle's dismissal of the complaints of Boyd and Olsen because they weren't formalized fails to take into account the fact that they both still worked for him at the time and that, in any event, they complained to Doyle's supervisor, Curley. It does not take much imagination to understand why it would be difficult to make a formal complaint about a person who has supervisory authority over you and that has used his "physical size aggressively," has made "vulgar and explicit" descriptions of women, and that "every medical facility in my territory did not want [Doyle] there." As for Olsen, as soon as it was safe to do so, *i.e.,* at his exit interview, Olsen gave feedback to Curley about the ways that Doyle's behavior made it difficult to continue his employment at Galderma.

Doyle further objects to the declarations of Olsen and Boyd because they weren't written until later in response to this lawsuit. However, this objection does not negate the facts testified to therein. Furthermore, Doyle does not state why this is a problem nor discuss what the declarants had to gain by spending their time writing declarations and being deposed. Olsen had already left Galderma, and Boyd was simply repeating the complaints he'd already made to Curley in early 2019.

Doyle's arguments are irrelevant to the fact that the complaints occurred and whether or not Doyle was notified about them is of no moment. The undisputed fact remains that Curley, Flores, and Collins became aware of multiple complaints from Doyle's reports before and during his PIP in Q1 2019. Doyle appears to believe that these complaints by the people with whom he presumably worked with most closely should not be taken into account when assessing his performance. But, as just one example, Flores considered Palomino's complaint serious enough to warrant her flying to California to interview her.

Learning of new complaints during Doyle's PIP compounded the previous complaints against him, all of which could and did affect the balance of factors in the Doyle's performance evaluation and the decision to terminate his employment. In fact, Curley told Doyle at his termination meeting that Galderma terminated his employment in part because of concerns about the recent customer complaints and the fact that Doyle had lost the trust and confidence of his team.

In sum, Doyle fails to demonstrate genuine issues of material facts as to whether he was "was performing competently in the position he held." The overwhelming, undisputed evidence of Doyle's poor sales performance in the last years of his employment with Galderma is not ameliorated either by Doyle's historical sales performance in years long past nor by the fact that Doyle was paid sales bonuses in accordance with Galderma's commission structure for the sales he did make. In contrast, Galderma presents overwhelming evidence that Doyle was not, in fact, performing competently when he failed to meet two out of five PIP deliverables, most saliently his sales quota, and was the subject of two customer complaints and complaints from his direct reports before and during his PIP – any one of which could constitute poor performance and

preclude Doyle from establishing a *prima facie* case.

###### b. Prong 4: Some Other Circumstances Suggesting A Discriminatory Motive

The Ninth Circuit has stated that the fourth element should be evaluated "with some flexibility." *Santillan*, 853 F.3d at 1043 (quoting *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 917 (9th Cir. 1996)). In claims for age discrimination, plaintiff may satisfy the fourth element *in part* by demonstrating that he was replaced by a substantially younger employee with equal or inferior qualifications. *Id.* (emphasis added). However, replacement by a younger person alone "does not prove age discrimination or even create a strong presumption of discrimination," as discharged employees more often than not will be replaced by younger employees. *Phipps*, 722 F. Supp. at 622. In granting defendant's motion for summary judgment, the *Phipps* Court noted that "[t]he progression of age is a universal human process. In the very nature of the problem, it is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are constantly moving out of the labor market, while younger ones move in." *Id.*

In *Santillan*, the Ninth Circuit relied on two pieces of evidence to overturn the district court's finding that plaintiff could not establish the fourth element of his *prima facie* age discrimination case. First, the plaintiff testified that he was one of five older Spanish-speaking employees who were fired or suspended once a specific person was assigned as defendant's route manager. Second, there was a potential thirteen-year age gap between the plaintiff and his replacement, who also had 21 fewer years of experience as a garbage truck driver.

In the instant case, in June 2019, Jordan Miller ("Miller") became the RSM of the San Francisco region at age 27. Doyle claims that the fact that he was replaced by a younger person is, by itself, evidence of some other circumstance that suggests a discriminatory motive. However, unlike in *Santillan*, where two pieces of evidence – language *and* age – suggested discrimination, Doyle provides no additional evidence of circumstances that would suggest Galderma had a discriminatory motive in terminating him. Furthermore, as noted by the *Phipps* Court, given that age is mutable characteristic over time, replacement by a younger person is not, standing alone,

indicative of discrimination.

Doyle also asserts that because Galderma "does not argue that the 27-year-old individual (Ms. Miller) promoted to fill Mr. Doyle's position was more or less qualified than plaintiff…. [Galderma's] admission that a 27-year-old individual took over plaintiff's job shortly after his firing is sufficient to satisfy the fourth element of an age discrimination claim." Doyle appears to believe that because Galderma presented no evidence regarding the qualifications of his younger replacement, the Court should assume she has equal or inferior qualifications to him. However, Doyle is mistaken regarding the burden of proof at this stage, as it is *his* burden to produce evidence that demonstrates a genuine issue of material fact on this – and every other – prong of the *prima facie* case. Doyle does not, for example, indicate that Miller, like him, had at least two years of sales results that placed her last in the nation among her Galderma peers. Nor does he allege that she is equal to him in having two customer complaints that threatened Galderma's sales or numerous complaints from subordinates lodged against her. The Court is not required to – and will not – fill in facts where Doyle fails to present evidence. On this matter, there are no inferences to be drawn in Doyle's favor where no evidence has been provided.

Notwithstanding the Ninth Circuit's admonition to evaluate the fourth element "with some flexibility," and even construing the evidence in the light most favorable to Doyle as the nonmoving party, Doyle's single assertion of replacement by a younger employee, without more, falls short of demonstrating "other circumstances suggesting a discriminatory motive." Perhaps if all other circumstances supported a *prima facie* case – most importantly, if Doyle's termination had come out of the blue when he was performing well in his job – such a scanty assertion might colorably suggest the existence of "some other circumstances suggesting a discriminatory motive." However, in the absence of actual evidence, Doyle cannot establish the fourth prong of his *prima facie* case.

In conclusion, drawing all reasonable inferences in the light most favorable to Doyle, the Court concludes that Doyle has failed to establish two of the four prongs required for a *prima facie* case of age discrimination. As a result, there is no presumption that Galderma unlawfully discriminated against Doyle and the burden of proof does not shift back to Galderma to provide a

legitimate, non-discriminatory reason for his termination.

### 2. Step Two: Galderma Offered A Legitimate, Non-Discriminatory Reason for Terminating Doyle's Employment

Had Doyle's *prima facie* case not suffered from the shortcomings described above, he would have created a presumption of unlawful discrimination and the burden would then have shifted to Galderma to offer a legitimate, non-discriminatory reason for terminating his employment.

"Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254. The burden that shifts to the defendant is to rebut the presumption of discrimination by producing evidence that the negative employment decision was made for a legitimate, nondiscriminatory reason. *See id.* "The defendant need not persuade the court that it was actually motivated by the proffered reasons . . . The explanation provided must be legally sufficient to justify a judgment for the defendant." *Id.* at 254-55. "[T]he employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Id.* at 256 (citations omitted). A reason is "legitimate" if it is "facially unrelated to a prohibited bias, and which if true, would preclude a finding of discrimination." *Guz*, 24 Cal. 4th at 358. The reason for termination need not have been wise or even correct, so long as it was nondiscriminatory. *Id.*; *Clarke v. Claremont Univ. Ctr.*, 6 Cal. App. 4th 639, 664 (1992). If the defendant meets this burden, any presumption of unlawful discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

The *McDonnell Douglas* requirement that plaintiff perform the job in a satisfactory manner "ties in to the express statutory 'good cause' defense and defendant's business justification for its decision." *Phipps*, 722 F. Supp. at 620. As mentioned above, courts in the Ninth Circuit have regularly found that terminating an employee's employment because of customer complaints is in itself a legitimate nondiscriminatory reason for terminating employment. In *Parks*, for example, the Court granted defendant's summary judgment motion against a professor's claim of age discrimination under FEHA where the disciplinary action was based on complaints by students.

*See Parks*, 813 F. Supp. 2d at 1194-95.

Assuming *arguendo*, then, that Doyle had established a prima facie case, the burden would shift back to Galderma to offer a legitimate, non-discriminatory reason for the adverse employment decision. As discussed at length above, Galderma has proven three distinct components of Doyle's poor performance: (1) poor sales performance for over two years preceding his termination, including failure to meet two out of five PIP Deliverables, one for sales results and the other for sales program execution, (2) two complaints during his PIP about his behavior from customers which threatened to damage Galderma's business, and (3) a history of complaints about his behavior from subordinates stretching back at least four years prior to his termination, plus additional complaints that came to light during his PIP.

Given that the Court has determined Galderma's reasons for terminating Doyle were nondiscriminatory, the Court need not determine if this decision was wise or even correct. Any or all of the components that resulted in Doyle's inability to state a *prima facie* case also constitute a legitimate, non-discriminatory reason to terminate him.

Thus, even if Doyle had established a *prima facie* case, Galderma amply satisfied its burden to produce evidence of poor performance that is, on its face, unrelated to age discrimination.

### 3. Step Three: Doyle Did Not Demonstrate Pretext.

Having met its burden, Galderma has rebutted the presumption of discrimination that would have been created had Doyle established a *prima facie* case. The burden would now shift back to Doyle, and the factual inquiry must proceed to a new level of specificity. *Burdine*, 450 U.S. at 255. "To avoid summary judgment, [the nonmoving party] 'must do more than establish a prima facie case and deny the credibility of the [the moving party's] witnesses. [He] must "produce 'substantial responsive evidence' that the employer's showing was untrue or pretextual," *Martin v. Lockheed Missiles & Space Co.,* 29 Cal. App. 4th 1718, 1735 (1994), "or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." *Horn,* 72 Cal. App. 4th 798, 806-07 (citing *Hersant v. Dep't of Soc. Servs.,* 57 Cal. App. 4th 997, 1004-1005

41

(1997)).

Even when the plaintiff relies on circumstantial evidence, that evidence must be "specific and substantial" to defeat the employer's motion for summary judgment. *Coghlan v. Am. Seafoods Co. LLC.,* 413 F.3d 1090, 1095-96 (9th Cir. 2005); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998), as amended (Aug. 11, 1998) (requiring "specific, substantial evidence of pretext").

A plaintiff can prove pretext "(1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable." *Earl,* 658 F.3d at 1112-13 (assessing age and disability discrimination claims under FEHA). Ninth Circuit law is clear that the plaintiff's burden at this stage is "minimal." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1127 (9th Cir. 2009). "[V]ery little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; and any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Id.* (internal quotation marks omitted). And, "[i]f a rational trier of fact could, on all the evidence, find that the employer's action was taken for impermissibly discriminatory reasons, summary judgment for the defense is inappropriate." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

However, the *Horn* court "emphasize[d] that an issue of fact can only be created by a conflict of evidence. It is not created by speculation or conjecture." *Horn*, 72 Cal. App. 4th at 807 (citing *Compton v. City of Santee,* 12 Cal. App. 4th 591, 595-596 (1993). Speculation of possible discrimination "cannot be regarded as substantial responsive evidence." *Martin*, 29 Cal. App. 4th at 1735. Nor, as stated above, can the employee simply show the employer's decision was wrong, mistaken, or unwise. *Horn*, 72 Cal. App. 4th at 806. Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer "that the employer did not act for the asserted non-discriminatory reasons." *Id.* (citations omitted).

Hence, assuming for the sake of argument that Doyle established a *prima facie* case of age discrimination, he must still prove by specific and substantial evidence that Galderma's stated reasons were pretextual, that Galderma acted with discriminatory animus, or both, such that the evidence would permit a reasonable trier of fact to conclude the Galderma intentionally discriminated against him. *Id.* at 806-807; *Hersant*, 57 Cal. App. 4th 997, 1009 (1997) ("what a trier of fact could not reasonably conclude, however, was that [defendant's] stated reasons were implausible, or inconsistent or baseless; it would not be reasonable to conclude that they were pretextual and used merely to veil an act of age discrimination."). Doyle cannot meet this standard.

### a. Doyle Has Not Produced Specific and Substantial Evidence That Reason Given for Termination Was Pretextual

### i. There Is No Direct Evidence of Discriminatory Motive

Direct evidence "is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption" and it "typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan,* 413 F.3d at 1095 (citing *Godwin*, 150 F.3d at 1221 (supervisor stated he "did not want to deal with [a] female.")). Because direct evidence is so probative, the plaintiff need offer "very little" direct evidence to raise a genuine issue of material fact. *Id.* Nevertheless, courts have found even occasional direct comments regarding age do not rise to indicating discriminatory animus. *See Nesbit v. Pepsico, Inc*., 994 F.2d 703, 705 (9th Cir. 1993).

Doyle has presented no direct evidence that Curley held discriminatory views or was motivated by discriminatory animus based on age either generally or against Doyle. To the contrary, Doyle himself testified in his deposition that Curley never said anything to Doyle that would cause him to believe that Curley wanted him terminated because of his age and that Curley never made a comment about Doyle's age or anyone else's age. Nor did Curley ever ask when Doyle might retire. Hence, here, there is no evidence of a single comment, let alone occasional direct comments regarding age, that would give rise to a finding of discriminatory animus.

ii.     There Is No Indirect Evidence of Discriminatory Motive

Circumstantial evidence, in contrast, is "evidence that requires an additional inferential step to demonstrate discrimination." *Coghlan,* 413 F.3d at 1095.  Such evidence can take two forms:  "First, the plaintiff can make an affirmative case that the employer is biased.  For example, statistical evidence is circumstantial evidence that could, if sufficiently probative, point to bias.  Second, the plaintiff can make his case negatively, by showing that the employer's proffered explanation for the adverse action is "unworthy of credence."  *Id.* (*citing Burdine*, 450 U.S. at 256).  Again, the evidence must be "specific and substantial" to defeat the employer's motion for summary judgment.  *Coghlan*, 413 F.3d at 1095-96 (citing*, inter alia, Nidds*, 113 F.3d at 918 (evidence must be "sufficiently probative").

Doyle engages in scattershot argumentation in an apparent attempt to see whether the Court will accept any of his attenuated articulations of possible pretext in the termination of an underperforming sales professional who is also the subject of complaints about inappropriate behaviors from customers and subordinates alike.  Doyle also appears to believe that simply listing these possibilities is sufficient without the need to make cogent legal arguments as to why they raise triable issues of material fact.

Doyle refers generally to his "Statement of Facts" to assert that he has presented "a plethora of detailed evidence to show pretext."  When boiled down, Doyle appears to make two basic arguments: performance – his was not so bad as to warrant a PIP and termination – and comparables – other similarly-situated employees were treated better than he was.  The Court will deal with each of these in turn.

### (a) The Performance Argument

Doyle argues that Galderma's actions demonstrated discriminatory pretext consistent with a pattern of discrimination against him because (i) placing Doyle on the PIP in the first place was not justified, (ii) giving Doyle the PIP on February 1, 2019 demonstrates discriminatory pretext, (iii) the content of the PIP was discriminatory: language creating a "forever PIP" and inclusion of a national average as a performance benchmark, (iv) Galderma fired him before release of final Q1 2019 Integrated Report so that the determination that he had not met PIP Deliverable 1, sales

United States District Court
Northern District of California

results, was premature and therefore discriminatory, and (v) listing Doyle's reason for termination as "Retired" not "Terminated for Cause" is evidence of discrimination.

### (i) Placing Doyle on a PIP Was Not Evidence of Discriminatory Animus

Doyle argues that discriminatory animus can be shown in placing him on a PIP to begin with. The Court has dealt at length with the low level of Doyle's sales results and will not address it further here. Suffice it to say that there are no disputed facts as to the quality of Doyle's sales performance which resulted in Galderma placing Doyle on a PIP.

Nevertheless, Galderma presented evidence that, once placed on a PIP, Curley tried to help Doyle succeed. During Doyle's PIP, Curley met with Doyle on a bi-weekly basis and received bi-weekly updates from Doyle. Curley told Doyle he was "here to support you and your efforts to succeed in Q1." Doyle was given tools to track his progress throughout his PIP via weekly data showing his sales results for the quarter through at least April 12, 2019. Doyle does not refute this fact but complains that they were only estimates.

In addition to this general help, Doyle was also given specific help. For PIP Deliverable 2, for example, Curley reduced the expectation of call cycle attainment from the 80% standard for all other RSMs to 75%, which Doyle was only able to achieve with Curley's further intervention. Prior to the end of the PIP, Curley removed the remaining PAMF targets from Doyle's San Francisco region, raising Doyle's call cycle coverage from 72% to the reduced 75%. Even so, at 75%, Doyle was behind the average for the West Area, which was 78% call cycle coverage.

Thus, contrary to Doyle's assertions that the PIP was a pretext for discrimination, certain aspects of the PIP actually decreased the results Galderma expected of Doyle and his supervisor went out of his way to help him meet even those reduced expectations.

### (ii) Giving Doyle the PIP on February 1, 2019 Does Not Demonstrate Discriminatory Pretext

Doyle argues that Galderma purposefully placed him on an unfair footing by giving him the PIP on February 1, 2019, not on the first day of Q1, in order to create grounds to terminate him based on unlawful age bias. However, as discussed in detail above, Doyle admits that he was

45

aware of the likelihood of a PIP as early as six months before it was put in place because, on June 26, 2018, Curley explicitly and unequivocally warned him that failure to hit his sales metrics "will result in a more formalized improvement plan being put in place." Doyle testified that he was aware of the PIP performance expectations before receiving the PIP because Curley had previously counseled him on them. Doyle also admitted that an important goal for him every year was to perform above goal with key brands.

Doyle's assertion in his declaration that he was unaware of standards in his PIP prior to February 1, 2019 is further belied by undisputed evidence that, in meetings with Curley and in multiple emails to Doyle and his fellow RSMs, Doyle was informed of his call cycle attainment, field coaching, extended selling budget, peer to peer ("sales events") and his sales quota in early January 2019. Plus, the PIP expectations were things that, as an RSM, Doyle should already have been working on since the beginning of the quarter anyway.

In contrast, Doyle produced no evidence that his PIP contained expectations that went beyond what Doyle already knew was expected of him before he received the PIP. Thus, Doyle has created no triable issues of fact that would enable a reasonable juror to conclude that Galderma treated him in a discriminatory manner by providing him with a PIP on February 1, 2019 that memorialized previously known expectations.

### (iii) The Content of The PIP Was Not Discriminatory: So-Called "Forever PIP" Language and Use of National Sales Average

Doyle argues Galderma's discriminatory intent is shown by (1) including in his PIP language that its performance expectations were to be considered as ongoing, which he claims makes his PIP uniquely a "forever PIP," and (2) using the national average as a benchmark for his sales performance. Nothing Doyle presents, however, creates triable issues of material fact.

Undisputed evidence shows that language in Doyle's PIP that these expectations are "permanent and to be maintained during the course of your employment with Galderma" came from an existing Galderma PIP template. Flores testified that neither she, King, nor Curley drafted the language but that it came from "a general template for [PIPs] as a guide." Galderma submitted both a copy of this template and another PIP containing the exact same "boilerplate"

46

1    language that Doyle claims singled him out.  The fact that managers were able "to use and

2    customize" the PIP template to "suit each employee's situation" is not, as Doyle contends,

3    evidence of discriminatory intent in drafting Doyle's PIP.

4         Doyle asserts that Galderma's contention that Curley was using a template that included

5    so-called forever language is "not believable in light of the sworn deposition testimony" of Flores

6    who said "you can't have an open-ended time" period, Collins who said he never saw "open

7    ended" PIP, and King who agreed that it was "good human resources practice based on [her]

8    experience and training to have very identifiable performance goals" and "good and important to

9    have a clearly articulated start and end date for the PIP."

10        At a minimum, Doyle asserts, a triable issue of fact exists as to whether or not he was

11   singled out and presented with a "forever PIP" in violation of Galderma's human resources

12   policies and practices.  But Doyle's attempts to interpret selected testimony of Galderma

13   employees to support his arguments are to no avail.  Their testimony was consistent that the cited

14   language intended only to communicate that Galderma expected Doyle to deliver, as Moseley

15   stated, "sustained performance for the rest of the time he was employed at Galderma."  Collins

16   agreed that Doyle had to meet the national sales average "at least until some unspecified time in

17   the future."  As Galderma argues, it is neither an unusual nor an unreasonable expectation for a

18   sales professional to sustain at least average sales results.

19        Moreover, the plain language of Doyle's Q1 2019 PIP makes it clear that Galderma was

20   measuring Doyle's performance solely for Q1 2019.  The PIP included a chart of expectations

21   with deliverable dates in Q1 2019 and results tied to Q1 2019 performance.  As Galderma points

22   out, it makes no sense to expect Doyle to meet his Q1 2019 sales quota permanently when

23   quarterly quotas are, by definition, issued every quarter.  Doyle's assertion that he was "singled

24   out" is contrary to the evidence that his deliverables were, by definition, solely for Q1 2019 and

25   that the so-called "forever" language came from a PIP template Curley used.  The Court notes that

26   Doyle attempts to play it both ways when he emphasizes that the precise language of the five

27   deliverables reference Q1 five times when he argues that Doyle should have received the PIP at

28   the start of the quarter.  This argument is especially ironic given that Doyle argues in the very next

47

section that language in the PIP made it a "forever PIP."

Doyle next argues that the requirement of PIP Deliverable 1 to meet his sales quota and to perform at or above 100% of the national average for total prescription attainment for Q1 is evidence of pretext, despite his acknowledgement that the goal was to perform above quota every year. He points to the testimony of King and Moseley, who indicated they weren't familiar with the use of the national standard to measure sales success.

However, Galderma presented uncontradicted testimony from Flores that Galderma uses the national sales average as "a common key performance indicator" to evaluate the performance of its sales professionals for several business reasons, including "rankings and awards and . . . in terms of where people fall." Collins testified about including the national average as a benchmark for Doyle because he had been "underperforming for the last couple of years relative to the nation." Collins was also clear about the need to reassess the standard based on Doyle's performance: "Now, does it mean [performing] exactly at the national average and all that forever and forever? I'm sure that we would re-evaluate that after the PIP, see where we were originally and then afterwards. . ."

Doyle also attempts – and fails – to manufacture a dispute about Galderma's use of the national average by making a perplexing, unwarranted, and factually unsupported accusation. Curley testified that he included the national sales metric to ensure that Doyle was performing at or above average relative to his peers to take into account any unforeseen market condition that might affect national sales numbers. Doyle twists this testimony to argue that "Curley included this metric so that even if 'a significant market event' occurred and the overall company performed at 'way above 100%' he would still have a way to fire Mr. Doyle." With no support in evidence presented to the Court, the Court declines to equate a spurious accusation with a factual dispute.

### (iv) Doyle's Termination Before the Release of Final Q1 2019 Integrated Report Was Not Discriminatory

Under the terms of the PIP, whether PIP Deliverable 1 had been met was to be determined as of the "Release of the Q1 Integrated Report," which shows final, verified sales data for Q1

2019, including Doyle's sales performance and Galderma's national sales average. Doyle asserts that, because the final Integrated Report for Q1 2019 was released on April 23, 2019, a day after he was fired, his performance could not have been the true motive for his termination. He argues that Galderma's decision-makers did not know whether Mr. Doyle met the sales performance standards in his PIP, that they were "unaware" of his final sales numbers, yet they fired him anyway. Doyle argues that "[a] reasonable juror could conclude that Galderma's first reason for plaintiffs termination, that he failed to meet his Q1 2019 quota, is not believable since the decision-makers did not have access to the required data to determine if this performance metric had been met yet, fired him anyway."

In his Opposition, Doyle painstakingly lays out the steps taken to compile the Integrated Report. Moseley receives and evaluates the sales information approximately two weeks after the last day of the month, here by April 14, 2019. She then sends the information to Collins for his review, which had to have happened well before the report was finalized on April 23, 2019. Thus, the evidence provided by Doyle himself proves that at least two of the Galderma employees involved in Doyle's termination had to have seen and analyzed the sales results for Doyle and all other RSMs.

Counsel for Doyle appears to have spent a good deal of time in depositions to obtain testimony that the Integrated Report shows final, verified sales data for Q1 2019 and that this report is used to calculate sales commissions. He went to great lengths to establish that Galderma employees, including Flores, Moseley, Collins, Curley, Boyd, and Jack, understood that sales commissions were paid out only on finalized data contained in Integrated Report. None of these facts are disputed – and none are relevant to the issue at hand. Yes, the report confirms sales data already known, formalizes and finalizes it into a report used to pay sales commissions, but there is no dispute that the report itself is not required to see where Galderma sales professionals fall in meeting their quota.

Doyle's vociferous argument that Galderma should have waited for the report's release before firing him may be technically true, but it is also irrelevant. Undisputed evidence shows that Galderma had access to what they needed to make the determination to fire Doyle. Although the

49

due date for PIP Deliverable 1 was the release of the Integrated Report, the sales data available before the final report was released demonstrated that Doyle had failed to meet his sales performance quota.

Galderma also presented evidence that it had sufficient information prior to the release of the final Q1 2019 Integrated Report to determine that Doyle had not met the sales deliverable of his PIP – both because Galderma had the necessary sales numbers and because Doyle himself had told Curley this was the case. Moseley, whose job as Galderma Sales Compensation Manager was to determine whether employees had met sales quotas, testified that she calculated that Doyle had fallen short of his Q1 2019 sales quota using the data through Friday, March 29, 2019, the last workday of the quarter, extrapolated for the final two days of the quarter (a Saturday and Sunday). Thus, sales data available through the last workday of the quarter was sufficient to verify that Doyle did not meet the deliverables of his PIP, as the numbers needed were not related to sales commissions, for which the final report was officially used. Once Doyle's failure was clear, Moseley then confirmed this fact to Human Resources Director, Edith Flores, who then reported it to Doyle's supervisor, Curley – all prior to the release of the final report

Doyle himself, despite complaining that weekly sales data to which he had access during his PIP were estimates only, had enough confidence in its accuracy to notify Curley in written progress reports on March 1 and March 22, 2019 that his region would miss the Q1 prescription sales target required by his PIP. As early as a week before the end of the Doyle's PIP, then, both Doyle and Curley knew that Doyle would not achieve his sales quota, *i.e.,* he would not meet his PIP Deliverable 1, because Doyle himself had made that clear. Hence, Galderma confirmed at the end of Q1 exactly what Doyle had told them all along would be the case: he fell short of his Q1 sales quota.

Doyle makes much of the timing of the release of the IR, which hadn't yet happened when they decided to terminate him. Doyle attempts to manufacture a factual dispute by arguing that there is conflicting testimony regarding who saw the Final Q1 Integrated Report and when, but the bottom line is that the data used to compile the report was available to Galderma decision-makers before they made the decision to terminate Doyle. Regardless of when the Integrated Report was

finalized, the undisputed evidence clearly shows that Galderma confirmed that Doyle did not meet all the deliverables on his PIP prior to finalizing the termination decision. The decision was made only after Flores confirmed with Moseley and then communicated to Curley that Doyle had not attained 100% of his Q1 2019 quota.

The true bottom line is that none of Doyle's arguments serve to dispute the fundamental, material fact of his poor performance. At either 95.14% or 94.53%, his overall attainment for Q1 2019 was almost 10% below the national sales average of 104.95%, which gave him the lowest quota attainment in the nation for each month of Q1 2019 and for the Q1 2019 quarter for any RSM or Senior RSM in the Rx Business Unit. Doyle fails to offer any evidence that Galderma's process with respect to confirming his poor sales performance or the details he was provided about his performance show that his termination was pretextual.

### (v) Listing Doyle's Reason for Termination As "Retired" Not "Terminated For Cause" Is Not Evidence of Discrimination

Doyle argues that his Termination Notice is evidence of pretext because it lists the reason for his dismissal as "Retirement" not "Released for Cause." However, Doyle presents no evidence to support this claim, instead "disputing" this fact by saying he "cannot speculate why Mr. Curley, Mr. Collins and Ms. Flores all signed their names on a Termination Form which indicates that Mr. Doyle retired."

For its part, Galderma presents Flores' testimony that Galderma classified Doyle as a retiree in his separation documentation "solely to facilitate the processing of the retiree medical benefits and reserve leave to which he was entitled." King confirmed that Doyle was terminated for performance. As someone who is not a human resources specialist, she could only speculate, saying, "I don't know why it shows voluntarily resignation – retirement, maybe for benefits eligibility."

Galderma's undisputed testimony establishes that Doyle's termination was internally characterized as a voluntary resignation solely for administrative convenience to process benefits and leave to which he was entitled. Thus, Doyle fails to demonstrate that his termination form raises any disputes of material fact concerning pretextual termination.

### (b) The Comparables Argument

Doyle's arguments that he was treated worse than comparable employees suffer from a fatal flaw: the calculations on which they are based were performed by his attorney. In his Declaration in Support of the Opposition, Attorney Robert Wallace admits that he "personally calculated the sales performance scores referenced in plaintiff's opposition brief" from documents produced by Galderma. He describes his "system of computation," but makes no claims regarding his skills or training to make such calculations. Accordingly, this comparison data lacks foundation and no comparisons based on sales results calculated in this way can form the basis of meaningful analysis.

Also, at various points during his arguments that he was treated worse than comparable employees, Doyle confuses the burden of proof. For example, he argues that Galderma failed to produce evidence that any other "bottom-performer" like Mr. Doyle was ever placed on a PIP. Doyle must meet the burden of proof to demonstrate pretext, as indeed the burden remains fundamentally his to prove age discrimination.

Despite these shortcomings, the Court will address Doyle's arguments that Galderma treated him differently than similarly situated employees because of his age and that Galderma's explanations for his termination are no more than pretext for the discriminatory animus by which it was motivated.

In employment discrimination cases, employees are similarly situated to a plaintiff if they perform similar work responsibilities or are guilty of similar misconduct. *Meaux v. Northwest Airlines, Inc.*, 718 F. Supp. 2d 1081, 1090-91 (N.D. Cal. 2010) (rejecting plaintiff's argument that he was treated differently than a similarly situated employee because differences in their misconduct rendered them not comparable).[6] "Courts require the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Day v. Sears Holdings Corp.,* 930 F. Supp. 2d 1146, 1162 (C.D. Cal. 2013) (different misconduct precludes finding that employees

---

[6] The Court follows 9th Circuit precedent for assessing comparable employees in discrimination cases rather than the 8th Circuit cases relied upon by Doyle.

were comparable). "Two employees are not similarly situated when one is a supervisor and the other is not." *Day*, 930 F. Supp. 2d at 1162 (finding employee and her supervisor not comparable).

The deadly substantive deficiency common to Doyle's comparables arguments is that he has submitted no evidence that any of the people to whom he compares himself were, in fact, similarly situated. Doyle produced no evidence showing that the employees to whom he compares himself have a comparable performance history or conduct, specifically the actual or equivalent history of sales achievement that earned them a rating of "Development Opportunity" as Doyle received in 2014, 2015, 2017, and 2018, plus the lowest possible "Needs Improvement" overall annual rating as Doyle received in 2018, plus ranking last in national sales in 2018, a position only one person, Doyle, could have occupied, not to mention two complaints from customers who found their behavior so problematic that they requested that they not return to their offices as Doyle did and multiple complaints from direct reports who, among other things, found their behavior overbearing and their supervision inadequate as Doyle did. In addition, some of the employees he compares himself to are facially not comparable, either people who supervise him, like Curley, or people he supervises.

Doyle's counsel claims that the ages of all "comparable" workers included in plaintiff's opposition brief were provided by defense counsel in verified discovery responses, but he fails to provide a cite for this most crucial piece of information in an age discrimination case. *See* Doyle's "Additional Undisputed Materials Facts" 216: "Wallace Decl. Para. ___" where Doyle's counsel left the paragraph number blank.

Despite these fundamental flaws shared by Doyle's "Comparable Arguments," the Court will respond briefly to each one made. Doyle rails against the idea that he would be held to a different standard because he was on a PIP: "A PIP cannot be a shield for intentional discrimination." However, the Court finds no evidence that the sales results to which Doyle was held in the PIP were based on "patently discriminatory standards." Furthermore, the performance issues Doyle had were, in themselves, justification for treating him differently from other employees without such issues.

53

Doyle reboots his argument that that discriminatory animus motivated Galderma to include the national sales average expectation as part of his PIP Deliverable 1 when such a requirement was not applied uniformly to comparable employees. The legitimate reasons Galderma explained for the including the national average in Doyle's PIP are dealt with extensively above. Nevertheless, Doyle disputes that he was held to expectations standard to all RSMs by referring to other RSMs whom he claims did not meet the national average and were not disciplined. However, the evidence Doyle cites fails to show that other RSMs were not expected to meet the national standard, only that some of them did not attain it and some of them were not disciplined.

Doyle's *opinion* that Galderma treated him unfairly compared to other employees is irrelevant and inadmissible. In the absence of credible evidence that any similarly situated employee was treated differently, Galderma's business decision to set an expectation as part of Doyle's PIP that he deliver an average performance compared to his peers does not demonstrate pretext. *Douglas v. Anderson*, 656 F.2d 528, 534 (9th Cir. 1981) (business decision need not meet the approval of a judge or jury, as long as the decision was not discriminatory.); *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions."). Hence, including the national average standard in Doyle's PIP is not evidence of pretext for discrimination.

Doyle also argues that no one else in the Western Region met the national average in Q1 2019 either, but his evidence to demonstrate this fact is damning on its face. The national average in Q1 2019 was 104.95. Doyle earned 94.53%, while every person to whom he compares himself earned above 100% except for Kelly Adams, who met 99.25% of her quota. Plus, as mentioned, Curley is not a comparable to Doyle because he is Doyle's supervisor.

Doyle argues that additional discriminatory evidence concerning his PIP Deliverable 1 lies in the fact that younger Galderma employees who performed below expectations were not disciplined or terminated. He argues that the Q1 2019 Integrated Report shows that Kelly Adams, age 33 at the time, Doyle's colleague who worked as a RSM for the Los Angeles territory[7] and

---

[7] The two-line deposition cite Doyle uses does not supply Adams' age or that she worked in the West region (*see* Wallace Decl., Curley Dep. 340:6-8), but the Court has read more of the

reported directly to Curley**,** also failed to meet her Q1 2019 sales quota, achieving 99.25% out of 100%. Doyle cites to Curley's deposition to assert that Adams "received no discipline of any kind," but Curley said only that Adams was not put on a PIP.

These assertions, without more, do not demonstrate discrimination as Doyle provides no other evidence showing that he and Adams were similarly situated. Besides the basic differences described above, Adams fell below her quota by only .75%, while Doyle fell at least 5.47% below his. In addition, Doyle did not submit evidence that Adams was not disciplined, only that she was not put on a PIP for missing her quota by less than 1%. Without evidence that Adams and Doyle were otherwise similarly situated, there is no triable issue of material fact so as to avoid summary judgment.

Doyle attempts to bolster his argument about discrimination by comparing his Q1 2019 sales results with those of "his far-younger peers in the West region, working for the same manager during the preceding 12 months" – based again on his attorney's calculations. He cherry-picks the results most convenient to him from among the 2018 Q2 and Q3 sales figures of Ruben Gonzalez, Holly Fitzhenry, Peterson Frey, and Kelly Adams that fall below his own Q1 2019 result. Doyle asserts that he "personally know[s]" that none of these individuals received any discipline for their quarterly scores" but, as with Adams, he has presented no actual evidence to this effect.

Doyle also claims that two Galderma employees had a full year of performance below Doyle's Q1 2019 results. These were: Jeff Paulson (36), 94.06% in 2017 and Jonathan Brisson (35) 93.15% in 2016. Ironically, the evidence Doyle himself submits further distinguishes Brisson as a comparator because Brisson was not managed by Curley at that time and he worked in the CentralSouth region not the West region where Doyle worked. In addition, Brisson attained

deposition excerpt that states Adams' age was 33 years old. Whether she worked in the West region was not established by the testimony cited either. The Court agrees with Galderma that Doyle's failure to provide pincites supporting a number of the facts he asserts renders them unsupported and therefore inadmissible. The Court is willing to look to surrounding evidence to see if the information is readily found, but it is not the Court's task to seek out evidence in support of a party's argument. *See generally Wu*, 626 F.3d at 488 ("Judges are not like pigs, hunting for truffles buried in briefs.")

99.68% of quota by the end of the following year.

Doyle classifies as "bottom-performers" in prior years three significantly younger RSMs whom he claims received no discipline at all. He identified "Jeff Paulson (36) Rank 7th out of 7 – 2017; Brenda DeHart (45) Rank 9th out of 9 – 2015; Pete Julien (33) Rank 8th out of 8 – 2012." Doyle's assertions, however, are based on partial and/or misstated evidence. Galderma presented evidence that, though not placed on a Performance Improvement Plan, Paulson's role was terminated as part of a reorganization where performance was a factor in selecting employees for elimination. Contrary to Doyle's statement, Galderma only indicated that Julian was not put on a Performance Improvement Plan or terminated in 2012, not that he received no discipline at all. In addition, the document Doyle attempts to introduce in support of the statement that DeHart was 9 out of 9 in 2015, does not include year-end rankings and is thus unsupported, plus he fails to include a cite to his assertion that DeHart received "no discipline at all." He also fails to provide a cite to the ages of Paulson, Julian, or DeHart.

Doyle also asserts that two of his younger peers were under quota for 2018 as well and neither of them was disciplined: Matt Chierchie (36 yrs. old) 95.00 in 2018 and Kelly Adams (32 yrs. old) 94.99 in 2018. Galderma admitted that Adams was not put on a Performance Improvement Plan or terminated in 2018 but also pointed out that she was promoted to an RSM position in July 2018, unlike Doyle who was not transferred in the middle of the year. Though Chirechie was not put on a Performance Improvement Plan or terminated in 2018, there's no evidence that he was not otherwise disciplined. In addition to all the other reasons Chirechie is not comparable to Doyle, Chirechie was never managed by Curley and worked in the East Area of the Prescription Business Unit. Once more, Doyle does not provide a cite to the ages of Chierchie or Adams.

Finally, Doyle also complains that "three other far-younger RSMs" – again, Ruben Gonzalez, Holly Fitzhenry, Peterson Frey – failed to complete their Peer to Peer sales programming requirement, as did he when he failed to complete part of his PIP Deliverable 5. He provides no foundation for his assertion that none of these individuals was disciplined. More to the point, Doyle submits no evidence regarding the rest of their performance so as to permit the

Court to assess whether they are at all "comparable" to him.

Based on the undisputed evidence, then, none of the employees Doyle discusses is comparable to Doyle with respect to Galderma's decision to put him on a PIP, with respect to the content of the PIP, or with respect to evaluating his performance while on a PIP. Doyle offers no admissible, relevant evidence to show pretext. Doyle has not shown that Galderma's stated reasons were pretextual or that Galderma acted with discriminatory animus, nor has he provided evidence of either that would permit a reasonable trier of fact to conclude the Galderma intentionally discriminated against him. *Horn,* 72 Cal. App. 4th at 806-07; *Hersant,* 57 Cal. App. 4th at 1009 ("what a trier of fact could *not* reasonably conclude, however, was that [defendant's] stated reasons were implausible, or inconsistent or baseless; it would not be reasonable to conclude that they were pretextual and used merely to veil an act of age discrimination") (emphasis added). In the absence of "specific substantial evidence" that Galderma's proffered reasons for terminating Doyle, namely his poor performance in sales and engendering complaints from customers and subordinates alike, were pretextual, Doyle's discrimination claim must fail.

None of the soft evidence or loud protestations demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Galderma's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer "that the employer did not act for the asserted non-discriminatory reasons."

Assessing the evidence as a whole and in the light most favorable to Doyle, Doyle has not met his burden of showing that triable issues of fact exist that Galderma's stated reasons for terminating Doyle were based on pretext. Doyle asserts many theories but, in the end, offers no credible evidence of discriminatory motive.

In conclusion, the Court finds that Doyle has failed to carry his initial burden of establishing a *prima facie* case of age discrimination because he clearly failed to meet Galderma's job expectations due to his poor work performance and multiple complaints lodged against him. He was also unable to demonstrate other circumstances that suggest discriminatory motive. Next, Galderma put forward legitimate, nondiscriminatory reasons to terminate Doyle's employment.

Finally, Doyle failed to prove that defendant's proffered reasons were in any way pretextual or discriminatory, either through direct or implied evidence. No facts have been shown otherwise which would give rise to an inference of discriminatory conduct. As a result, Doyle has failed to present any genuine issue of material fact as to his age discrimination claims.

Accordingly, Galderma's Motion for Summary Judgment on Doyle's first cause of action for age discrimination pursuant to FEHA is **GRANTED**.

**B.      Doyle's Second Cause of Action for Wrongful Termination in Violation of Public Policy Fails for the Same Reasons as his FEHA Claim**

Doyle's second cause of action, the common law claim for wrongful termination in violation of public policy, asserts the same theory of liability as his discrimination claim and is properly analyzed under the same legal framework. *Hanson v. Lucky Stores, Inc.,* 74 Cal. App. 4th 215, 229 (1999) ("because plaintiff's FEHA claim fails, his claim for wrongful termination in violation of public policy fails"); *Reno v. Baird*, 18 Cal. 4th 640, 663 (1998) (applying ruling on discrimination cause of action to wrongful discharge cause of action based on FEHA).

Because Doyle failed to provide evidence that raises any triable issues of material fact with respect to his FEHA claim, his derivative claim for wrongful termination in violation of public policy fails as a matter of law.

Accordingly, Galderma's Motion for Summary Judgment on Doyle's second cause of action for wrongful termination in violation of public policy is **GRANTED**.

**C.      Doyle's Claim for Breach of Implied Contract Not to Terminate Without Good Cause Fails as a Matter of Law**

The undisputed evidence shows that Doyle was – and knew he was – an at-will employee. Section 2922 of the California Labor Code provides that, "[a]n employment, having no specified term, may be terminated at the will of either party on notice of the other." Cal. Lab. Code § 2922. In California, employment of an unspecified term is presumptively at-will and absent proof of a contrary agreement or limitation, an employer may effectively terminate an employee at any time and for any reason, without application of just cause, and without providing warning or fair procedures. *Guz*, 24 Cal. 4th at 335-36, 350. A plaintiff's own unspecified, conclusory statements

and interpretation of an employer's conduct are insufficient as a matter of law to negate the statutory presumption and the employer's actual practice of at-will employment. *Eisenberg v. Alameda Newspapers, Inc.,* 74 Cal. App. 4th 1359, 1389 (1999) (affirming grant of summary judgment for employer where convincing evidence reinforced the statutory presumption of at-will employment). "[L]ong duration of service, regular promotions, favorable performance reviews, praise from supervisors, and salary increases do not, without more, imply an employer's contractual intent to relinquish its at-will rights." *Guz*, 24 Cal. 4th at 341.

Although normally a question of fact, whether an employer's conduct implies an agreement to terminate an employee only for cause may be determined by a court on summary judgment where the facts are undisputed and support only a single conclusion. *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 682 (1998); *Eisenberg,* 74 Cal. App. 4th at 1386. To raise a triable issue of material fact, a plaintiff must produce evidence of an agreement that he could not be discharged without good cause. *Gould v. Maryland Sound Indus., Inc.,* 31 Cal. App. 4th 1137, 1151-53 (1995).

Galderma reiterated Doyle's at-will employment status multiple times: in his 1999 promotion letter, in the applicable Galderma Employee Handbook and, most recently, in his PIP. Doyle was put on notice as early as the middle of 2018 that he had to perform better or face an unsatisfactory rating, which could well result in him being placed on a PIP. His actual placement on a PIP after he failed to meet his sales metrics communicated to Doyle that his job was at risk. When he was put on the PIP, he had the opportunity to cure the issues – but he did not. The most direct indication of his continued long-term at-will status is his own testimony to that effect in his deposition, where he explicitly admitted that there was no employment contract. Furthermore, Doyle admitted at his deposition that he knew if he did not improve his performance during the PIP that the result would be termination.

Doyle says that Galderma acted as if he could only be fired for cause. He asserts that, "based upon Galderma's conduct over his 30-year career, Mr. Doyle understood that Galderma needed good cause to fire him." However, Doyle fails to supply evidence of an agreement that he could not be discharged without good cause that contradicts the at-will employment status

Galderma repeatedly reaffirmed. Doyle's interpretation – his hope – of an agreement to overturn that presumption does not change the at-will status of his employment. Doyle failed to submit evidence that Galderma's conduct imputed an intent to establish an implied contract for continued employment. Hence there is nothing that contradicts the statutory presumption of Doyle's at-will employment status so as to defeat summary judgment.

Further, even assuming arguendo that Doyle could establish that he was party to an implied contract for employment, Galderma has proffered ample undisputed evidence that Galderma had good cause to terminate Doyle's employment based on his poor performance. As there is no dispute of material fact on this issue, Doyle's claim for implied breach of contract fails as a matter of law.

Accordingly, Galderma's Motion for Summary Judgment on Doyle's third cause of action for breach of implied contract is **GRANTED**.

### D. Doyle's Prayer for Punitive Damages Fails

Under California law, an employer may be held liable for punitive damages only for the malicious acts or omissions of employees who possess sufficient discretion to determine corporate policy, such as officers, directors or managing agents. Cal. Civ. Code § 3294(b); *see also Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1147-48 (1998) (Civil Code § 3294 applies to actions brought under the FEHA). Pursuant to California Civil Code § 3294, "malice" means conduct intended to cause injury or "despicable conduct" which is carried out with "willful and conscious disregard of the rights and safety of others." Cal. Civ. Code § 3294(c)(1). "Oppression" is defined as "conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2).

The standard for awarding punitive damages requires "the evidence [to] be so clear as to leave no substantial doubt" and "sufficiently strong to command the unhesitating assent of every reasonable mind." *Mock v. Michigan Millers Mutual Ins. Co.*, 4 Cal. App. 4th 306, 332-33 (1992). Thus, mere establishment of discrimination or retaliation is not enough; there must be some "extreme" conduct that is above and beyond the pale.

Doyle's claim for punitive damages fails because he has presented no evidence Galderma

1    engaged in "despicable conduct" with "willful and conscious disregard of the rights and safety of

2    others." Even if absolutely everything Doyle alleges was one hundred percent as he alleges it –

3    even if Galderma placed him on a PIP but not younger co-workers who also spent several years at

4    the bottom of the national sales ranks, even if Galderma gave him the PIP a month late with

5    deliverables that were entirely new to him, even if Galderma intended that the PIP last for as long

6    as Doyle worked at Galderma, even if Galderma expected that he would meet or exceed both his

7    own sales quota and the national sales average – even if all of this were true, or if Doyle produced

8    evidence that suggested it could be true, which he has not demonstrated by a long shot, even then

9    punitive damages would not be warranted.

10        Doyle has not even established discrimination, let alone some "extreme" conduct that is

11   above and beyond the pale. When Doyle failed to meet two of the five deliverables and when

12   Galderma became aware of both customer and direct report complaints during the same time

13   frame, Galderma fired him. But being fired because you no longer can or want to do a particular

14   job is in no way comparable to malicious conduct that threatens your rights and safety.

15        Constantly lagging behind your colleagues must be frustrating – but it is not oppressive.

16   Losing a job is painful, maybe embarrassing and economically stressful – but it is not being the

17   victim of despicable conduct carried out with willful and conscious disregard of the rights and

18   safety of others.

19        Doyle lists off the number of people Collins and Curley supervise, but these facts fail to

20   establish that that Curley, Collins, or Flores had power to manage high level corporate affairs or

21   that they had authority to influence or affect corporate policy to the degree required for punitive

22   damages. Doyle does not even allege that Curley, Collins, or Flores were officers or directors.

23        Doyle's prayer for punitive damages fails, as a matter of law, because he cannot establish

24   that an officer, director or managing agent engaged or ratified any malicious, oppressive, or

25   fraudulent conduct against him. Doyle has presented an insufficient quantum of evidence as to

26   both position and power of the Galderma employees involved with his termination and that shows

27   conduct strong enough "to command the unhesitating assent of every reasonable mind." His claim

28   for punitive damages therefore fails as a matter of law.

Accordingly, Galderma's Motion for Summary Judgment on Doyle's prayer for punitive damages is **GRANTED**.

## CONCLUSION

Based on the analysis above, Galderma's Motion for Summary Judgment is **GRANTED** in its entirety.

**IT IS SO ORDERED.**

Dated: April 30, 2021

THOMAS S. HIXSON
United States Magistrate Judge